Nos. 23-13360; 23-13361; 23-13362

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

**DAVID J. SHAFER, SHAWN STILL, CATHLEEN LATHAM**
**Appellants,**
v.
**STATE OF GEORGIA,**
**Appellee.**

On Appeal from the United States District Court
For the Northern District of Georgia
No. 1:23-cv-03720-SCJ; No. 1:23-cv-03792-SCJ; No.
1:23-cv-03803-SCJ;
Hon. Steve C. Jones

## APPELLANTS' JOINT BRIEF

Craig A. Gillen
Georgia Bar No. 294838
Anthony C. Lake
Georgia Bar No. 431149
**GILLEN & LAKE LLC**
400 Galleria Parkway, Ste 1920
Atlanta, Georgia 30339
(404) 842-9700
cgillen@gwllawfirm.com

Holly A. Pierson
Georgia Bar No. 579655
**PIERSON LAW LLC**
171 17th Street, Ste. 1550
Atlanta, GA 30363
(404) 353-2316
hpierson@piersonlawllc.com
*Counsel for David J. Shafer*

Thomas D. Bever
Georgia Bar No. 055874
W. Cole McFerren
Georgia Bar No. 409248
**Smith, Gambrell & Russell, LLP**
1105 W. Peachtree St., NE, Ste. 1000
Atlanta, GA 30309
(404) 815-3500
tbever@sgrlaw.com
cmcferren@sgrlaw.com
*Counsel for Shawn Still*

William G. Cromwell
Georgia Bar No. 197240
**CROMWELL LAW, LLC**
400 Galleria Parkway, Suite 1920
Atlanta, GA 30339 / (678) 384-5626
bcromwell@cartercromwell.com
*Counsel for Cathleen Latham*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellants file this Certificate of Interested Persons and Corporate Disclosure Statement, listing all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party, as follows:

Alex M. Bernick, Counsel for Appellee

Thomas Bever, Counsel for Appellant Shawn Still

Bondurant Mixson & Elmore LLP, Counsel for Appellee

Paul Clement, Counsel for Mark Meadows

Clement & Murphy, LLP, Counsel for Mark Meadows

William "Bill" Cromwell, Counsel for Appellant Cathleen Latham

Anna G. Cross, Counsel for Appellee

Cross Kincaid, Counsel for Appellee

John E. Floyd, Counsel for Appellee

Craig A. Gillen, Counsel for Appellant David J. Shafer

Gillen & Lake LLC, Counsel for Appellant David J. Shafer

The Honorable Steve C. Jones, United States District Judge

Anthony C. Lake, Counsel for Appellant David J. Shafer

i

Cathleen Latham, Appellant

Zachary Lustbader, Counsel for Mark Meadows

Cole McFerren, Counsel for Appellant Shawn Still

McGuire Woods, LLP, Counsel for Mark Meadows

Mark Meadows, Appellant in Related Case

John S. Moran, Counsel for Mark Meadows

Erin Murphy, Counsel for Mark Meadows

Adam S. Ney, Counsel for Appellee

Holly A. Pierson, Counsel for Appellant David J. Shafer

Grant H. Rood, Counsel for Appellee

David J. Shafer, Appellant

Shawn Still, Appellant

State of Georgia, Appellee

George Terwilliger, III, Counsel for Mark Meadows

Terwilliger Law PLLC, Counsel for Mark Meadows

Nathan J. Wade, Counsel for Appellee

Wade & Campbell Firm, Counsel for Appellee

Francis M. Wakeford, IV, Counsel for Appellee

Fani T. Willis, Counsel for Appellee

John W. Wooten, Counsel for Appellee

Daysha D. Young, Counsel for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Appellants David Shafer, Shawn Still, and Cathy Latham respectfully request oral argument. This consolidated appeal raises novel legal issues that no federal appellate court has decided, including whether Presidential Electors are federal officers for purposes of the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and whether the State is barred by the Supremacy Clause and federal preemption from prosecuting them.

## <u>TABLE OF CONTENTS</u>

**CERTIFICATE OF INTERESTED PERSONS**……………………………i

**STATEMENT REGARDING ORAL ARGUMENT**…………………………iv

**TABLE OF CONTENTS**…………………………………………… v

**TABLE OF AUTHORITIES**…………………………………… viii

**INTRODUCTION**…………………………………………………1

**STATEMENT OF JURISDICTION**……………………………………..2

**STATEMENT OF THE ISSUES**……………………………………2

     **I.**    **Whether Presidential Electors, Who Are Created By The Constitution And Elected to Their Offices In Federal Elections to Perform Exclusively Federal Duties and Functions Derived Solely From the U.S. Constitution and Federal Law, Are Federal Officers For Purposes Of The Federal Officer Removal Statute?**

     **II.**   **Whether the District Court Erred In Refusing To Consider Appellant Shafer's Requests for Pretrial Habeas or Injunctive Relief on The Merits?**

**STATEMENT OF THE CASE**…………………………………… 3

  **A.**  **Legal Background**……………………………………...3

     *1. Presidential Electors As Creatures of the U.S. Constitution*………. 3

     *2. The Electoral Count Act of 1887*…………………………… 7

  **B.** **Factual Background**…………………………………… 11

     *1. The 2020 Presidential Election*…………………………… 11

*2. The Fulton County District Attorney's Investigation and Prosecution of the Presidential Electors*……………………....12

*3. Proceedings In The District Court and Appeal to This Court*……14

**SUMMARY OF THE ARGUMENT**………………………………...14

**STANDARD OF REVIEW**………………………………………...18

**ARGUMENT**……………………………………………………..19

**I.    The Federal Officer Removal Statute Applies to Former Federal Officers Like Presidential Electors**…………………………   21

**II.    Presidential Electors Are Federal Officers for Purposes of the Removal Statute**……………………………………....   23

**A.    Because Presidential Electors Are Created By the Constitution And Elected By Ballot in Federal Elections to Perform Exclusively Federal Duties, They Are Federal Officers Entitled to Removal Under Section 1442**………..   24

*1. The District Court Erred In Relying On The State's Constitutional Appointment Power to Determine Presidential Electors Are Not Federal Officers*……..……..……..……28

*2. The District Court Erred In Relying On Supreme Court Dicta Regarding State Appointment Power Instead of More Recent Supreme Court Precedent Abrogating It*……..…..……..…..……..……..……..……..……29

*3. Like the Members of Congress, Presidential Electors Are Federal Officers For Purposes of Removal*……..……..……..……..……..……..……..……   33

**B.    The District Court Erred In Relying On Other Portions of the Electors Clause to Deny Removal**……………………....   35

vi

C.  In the 2020 Election In Georgia, Both Sets of Presidential Electors Were Contingently Elected, And Both Sets Were Federal Officers For Purposes of the Federal Removal Statute……………………………………………….……    39

III.  The District Court Erred In Declining to Consider Mr. Shafer's Request for Habeas and Injunctive Relief….……… 46

A.    The District Court Erred As A Matter of Law In Declining to Consider Mr. Shafer's Request for Habeas Relief On The Merits Based Upon Its Incorrect Application of *Younger* Abstention Principles…………...…    47

1. *Younger Abstention Does Not Apply In Cases, Like This One, Where Federal Preemption Is Facially Conclusive*……..…..49

2. *The District Court Improperly Disregarded Applicable Supreme Court Precedent*……..…..……..…..……..….…… 54

B.    The District Court Erred in Declining to Consider Mr. Shafer's Request for Injunctive Relief on the Merits……………………………………………………    55

CONCLUSION…………………………………………………56

## TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                    Page(s)

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) ........................................................................ 33

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ..................................................... 2, 55, 56, 57

*Baldwin v. Express Oil Change, LLC*,
  87 F.4th 1292 (11th Cir. 2023) ...................................................... 18

*BP P.L.C. v. Mayor & City Council of Baltimore*,
  141 S. Ct. 1532 (2021)................................................................ 2, 47

*Braden v. 30th Jud. Cir. Ct. of Kentucky*,
  410 U.S. 484 (1973) ........................................................................ 47

*Brown & Williamson Tobacco Corp. v. Williams*,
  62 F.3d 408 (D.C. Cir. 1995) .......................................................... 33

*Burroughs v. United States*,
  290 U.S. 534 (1934) ................................................................*passim*

*Bush v. Gore*,
  531 U.S. 98 (2000) ............................................ 6, 24, 25, 31, 53, 54

*Castleberry v. Goldome Credit Corp.*,
  408 F.3d 773 (11th Cir. 2005) ........................................................ 18

*Caver v. Cent. Alabama Elec. Coop.*,
  845 F.3d 1135 (11th Cir. 2017)........................................................ 20

*Chiafalo v. Washington*,
  140 S. Ct. 2316 (2020)........................................................................ 5

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ....................................................................... 48

*Cook v. Gralike*,
    531 U.S. 510 (2001) ....................................................................... 27

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975) ....................................................................... 48

*Ex parte Royall*,
    117 U.S. 241 (1886) ....................................................................... 48

*Ex parte Young,*
    209 U.S. 123 (1908) ....................................................................... 55

*Fair Assessment in Real Est. Ass'n, Inc. v. McNary*,
    454 U.S. 100 (1981) ....................................................................... 49

*Fay v. Noia*,
    372 U.S. 391 (1963) ....................................................................... 49

*Foster v. Love*,
    522 U.S. 67 (1997) ......................................................................... 33

*Georgia v. Heinze,*
    637 F. Supp. 3d 1316 (N.D. Ga. 2022) .......................................... 29

*Hill Parents Ass'n v. Giaimo*,
    287 F. Supp. 98 (D. Conn. 1968) .................................................. 33

*Hughes v. Att'y Gen. of Fla.,*
    377 F.3d 1258 (11th Cir. 2004) ............................................... 49, 50

*In re Asbestos Prod. Liab. Litig. (No. VI),*
    770 F. Supp. 2d 736 (E.D. Pa. 2011) ............................................ 23

*In re Green*,
    134 U.S. 377 (1890) ................................................................. 30, 31

*In re Loney*,
134 U.S. 372 (1890) .................................................................................... 47, 54

*In re Neagle*,
135 U.S. 1.................................................................................................. 47

*Jysk Bed'N Linen v. Dutta-Roy*,
810 F.3d 767 (11th Cir. 2015) ............................................................ 18

*Kolski v. Watkins*,
544 F.2d 762 (5th Cir. 1977) ............................................................ 49

*Liu v. Sec. & Exch. Comm'n*,
140 S. Ct. 1936 (2020)...................................................................... 57

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*,
939 F.3d 1145 (11th Cir. 2019)...................................................... 19

*McPherson v. Blacker*,
146 U.S. 1 (1892) ....................................................................... 5, 29

*Mesa Air Grp., Inc. v. Delta Air Lines, Inc.*,
573 F.3d 1124 (11th Cir. 2009)...................................................... 18

*Murray v. Carrier*,
477 U.S. 478 (1986) .................................................................. 48, 49

*New York v. Trump*,
No. 23 Civ 3773 (AKH), 2023 WL 4614689 (S.D.N.Y. July 19, 2023)........... 22

*Nixon v. Fitzgerald*,
457 U.S. 731(1982) ...................................................................... 22

*Oregon v Mitchell*,
400 U.S. 112 (1970) ............................................................... 30,31, 36

*People of State of New York v. Eno*,
155 U.S. 89 (1894) ....................................................................... 47

*Ray v. Blair*,
343 U.S. 214 (1952) ......................................................... 7, 27, 29, 31

*Richards v. Harper*,
864 F.2d 85 (9th Cir. 1988) ................................................... 33

*Smith v. Meese*,
821 F.2d 1484 (11th Cir. 1987)............................................. 56

*State v. Meadows*,
Cse No. 23-12958 (11ᵗʰ Cir. Dec. 18, 2023).................................... 21

*U.S. ex rel. Noia v. Fay*,
300 F.2d 345 (2d Cir. 1962), *aff'd sub nom Fay v. Noia, 83 S.Ct. 822 (1963), abrogated on other grounds by Wainwright v. Sykes,* 433 U.S. 72 (1977) ........ 47

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) ................................................................*passim*

*United States v. Classic*,
313 U.S. 299 (1941) ................................................................. 31

*United States v. Trump*
Case No. 1:23-cr-00257-TSC (D.D.C. Aug. 1, 2023) ...................................... 38

*Ward v. Hall*,
592 F.3d 1144 (11th Cir. 2010)................................................... 18

*Watson v. Phillip Morris Cos.*,
551 U.S. 142 (2007) ............................................................ 23, 37

*Wildenhus's Case*,
120 U.S. 1 (1887) ................................................................. 47

*Williams v. Brooks*,
945 F.2d 1322 (5th Cir. 1991) .................................................... 33

*Willingham v. Morgan*,
395 U.S. 402 (1969) ................................................................. 23

## Statutes

3 U.S.C. § 1 ..................................................................*passim*

3 U.S.C. § 5 ..................................................................*passim*

3 U.S.C. § 15 ................................................................*passim*

3 U.S.C. § 6 ............................................................... 16, 43

28 U.S.C. § 1442..........................................................*passim*

28 U.S.C. § 1445.......................................... 1, 2, 19, 35

28 U.S.C. § 1447(d).......................................... 2, 47

28 U.S.C. § 2241.......................................... 2, 22, 47

O.C.G.A. § 16-4-1 .................................................. 13

O.C.G.A. § 16-9-1 .................................................. 13

O.C.G.A. § 16-10-20.............................................. 13

O.C.G.A. § 16-10-20.1........................................... 13

O.C.G.A. § 16-10-23.............................................. 13

O.C.G.A. § 16-14-4 .............................................. 13

O.C.G.A. § 21-2-10 ................................................ 5

O.C.G.A. § 21-2-13 .............................................. 39

O.C.G.A. § 21-2-134.............................................. 5

O.C.G.A. § 21-2-172.............................................. 5

O.C.G.A. § 21-2-285.......................................... 6, 24

O.C.G.A. § 21-2-495.............................................................. 11

O.C.G.A. § 21-2-520.......................................................... 9, 41

O.C.G.A. § 21-2-521.............................................................. 11

U.S. Const. Art. I, § 5 ............................................................ 35

U.S. Const. Art. I, § 6 ............................................................ 37

U.S. Const. Art. II, § 1 .....................................................*passim*

U.S. Const. Amend. XII ...................................................*passim*

**<u>Other Authorities</u>**

Dan Coenen & Edward Larson, *Congressional Power over Presidential Elections:*
*Lessons from the Past and Reforms for the Future,*
43 Wm. & Mary L. Rev. 851 (2002)......................................... 4, 7, 8, 10, 16, 45

Edward B. Foley, *Preparing for A Disputed Presidential Election: An Exercise in*
*Election Risk Assessment and Management,*
51 Loy. U. Chi. L.J. 309 (2019) ....................................................... 11

Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral*
*Count Act of 1887,*
56 Fla. L. Rev. 541 (2004)...........................................................*passim*

## INTRODUCTION

This case presents a question of first impression: whether Presidential Electors, who are created by the U.S. Constitution and elected by ballot in federal elections to perform exclusively federal duties and functions derived solely from the U.S. Constitution and federal law, are federal officers for the broad purposes of the Federal Officer Removal Statute, 28 U.S.C. §§ 1442 and 1445 ("Section 1442" or the "Removal Statute"). No federal appellate court has decided this issue. The language and purpose of the Removal Statute, however, in conjunction with the Constitution, the Electoral Count Act ("ECA"),[1] and precedent make clear that Presidential Electors must be federal officers for purposes of the Removal Statute, and the District Court's contrary conclusions should be reversed.

The District Court also erred in declining to address Appellant Shafer's request for pretrial habeas or injunctive relief on the merits. The court erroneously determined that the *Younger* abstention factors were not adequately addressed. This Court's precedent, however, is plain that *Younger* abstention does not apply when, as here, the State's criminal prosecution is facially and conclusively preempted by the U.S. Constitution and federal law. This ruling, too, must therefore be reversed.

---

[1] The ECA was amended by Congress effective in 2022. The references to the ECA in this brief refer to the pre-amended version in effect in December 2020, the time of the events in the State's indictment.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over the Appellants' Notices of Removal pursuant to 28 U.S.C. §§ 1442 and 1445 and over Appellant Shafer's request for pretrial habeas relief and injunctive relief under 28 U.S.C. § 2241 and the court's inherent equitable and injunctive powers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This Court has appellate jurisdiction over all of the claims raised on appeal pursuant to 28 U.S.C. § 1447(d) and *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542-43 (2021) (clarifying that appeals pursuant to 28 U.S.C. § 1447(d) encompass everything in district court's remand order).

## STATEMENT OF THE ISSUES

I.    Whether Presidential Electors, Who Are Created By The Constitution And Elected to Their Offices In Federal Elections to Perform Exclusively Federal Duties and Functions Derived Solely From the U.S. Constitution and Federal Law, Are Federal Officers For Purposes Of The Federal Officer Removal Statute?

II.    Whether the District Court Erred In Refusing To Consider Appellant Shafer's Requests for Pretrial Habeas or Injunctive Relief on The Merits?

## STATEMENT OF THE CASE

### A.  Legal Background

#### 1.  Presidential Electors As Creatures of the U.S. Constitution.

Presidential electors are created by the U.S. Constitution.  *See* U.S. Const. Art.

II, § 1.[2]  Their actions are mandated and governed exclusively by the Constitution

and federal law.  *See id.*; U.S. Const. Amend. XII; 3 U.S.C. § 1 *et seq.*

The Constitution directs Presidential Electors to meet in their States, vote by

ballot for President and Vice President, make a list of all the persons voted for, to

sign and certify the list, and transmit it sealed to the President of the U.S. Senate.

---

[2] Article II, § 1 provides in pertinent part as follows with regard to Presidential Electors:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

> The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted.

> *       *       *       *       *

> The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

*See* Art. II, § 1, cl. 3; Amend XII. Under the Twelfth Amendment and the ECA**,** Congress has *sole authority* to receive, adjudicate, and count Presidential Elector ballots, specifically including more than one Presidential Elector ballot from a State. *See* Amend. XII; 3 U.S.C. § 15 (explaining in detail how Congress will adjudicate between multiple Presidential Elector "return[s] *or paper[s] purporting to be a return from a State*.") (emphasis added); *see generally* Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 541, 625-34 (2004) (describing Congress' adjudication of multiple presidential elector ballots from one State); Dan T. Coenen & Edward J. Larson, *Congressional Power over Presidential Elections: Lessons from the Past and Reforms for the Future*, 43 Wm. & Mary L. Rev. 851, 866-67 (2002) (same).

Because Presidential Electors are created by the Constitution, States have no original, reserved, or traditional police power over them. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995). Any State authority to regulate them "had to be delegated to, rather than reserved by, the States." *Id.* at 805. The Tenth Amendment "could only 'reserve' that which existed before the Constitution and "*the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government,* which the constitution does not delegate to them. No state can say that it has reserved *what it never possessed*." *Id.* (quoting 1 Story § 627) (emphasis added).

For Presidential Electors, the Constitution's only express delegation to the States is found in Art. II, § 1, cl. 2: "Each State shall appoint, in such Manner as the Legislature thereof may direct," its Presidential Electors.[3]    Thus, the Constitution gives state legislatures the power to decide the manner of Presidential Elector *appointment*.  As used in the Electors Clause, the word "Manner" refers to the "form" or "method" of selection of the Presidential Electors.  It requires state legislatures merely to set the approach for selecting Presidential electors.  *Chiafalo v. Washington*, 140 S. Ct. 2316, 2330 (2020) (Thomas, J., concurring) (citations omitted). "It has been said that the word 'appoint' is not the most appropriate word to describe *the result of a popular election*.  Perhaps not; but it is sufficiently comprehensive to cover that mode[.]"  *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) (emphasis added).

In Georgia, the legislature has chosen the popular vote as the manner of appointing Presidential Electors.  *See, e.g.,* O.C.G.A. § 21-2-10.  Each slate of Presidential Electors is put on the ballot every four years in federal presidential elections,[4] and the citizens vote for the slate of electors that they want to appoint to

---

[3] In Georgia, Presidential Elector nominees are chosen by the state's political parties and then elected based upon the results of the state's popular vote. *See, e.g.,* O.C.G.A. § 21-2-134 (nomination of presidential electors); O.C.G.A. § 21-2-172 (nomination of candidates by convention).

[4] In Georgia, the names of the Presidential Electors themselves are not placed on the ballot.  Instead, the name of the presidential candidate for the political party is printed on the ballot as a proxy for the Presidential Electors.  *See, e.g.,* O.C.G.A. §

the Electoral College to vote for President and Vice President. Once the citizens have voted on Election Day, the appointment power of the State is at an end, and the State's constitutional authority over Presidential Electors ends. *See* Art. II, § 1, cl. 3; Amend. XII; 3 U.S.C. § 1.[5]

All *constitutional* authority over Presidential Electors after Election Day resides *solely with Congress*, *see* Art. II, § 1; Amend. XII; 3 U.S.C. §§ 1, 15, including Congress' sole authority to adjudicate disputes between two or more contingently elected sets of Presidential Electors from a State in a disputed election. *See* Amend. XII; 3 U.S.C. § 15.[6] Additionally, all duties and functions that Presidential Electors (including those contingently elected) perform after Election

---

21-2-285 ("When *presidential electors are to be elected*, the ballot shall not list the individual names of the candidates for presidential electors but shall list the names of each political party or body and the names of the candidates of the party or body for the offices of President and Vice President of the United States.") (emphasis added).

[5] This clause provides that "[t]he Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Pursuant to that authority Congress has enacted 3 U.S.C.A. § 1.

[6] The ECA's legislative history clarifies that Congress alone has the power to resolve post-Election Day disputes over Presidential Electors: "The two Houses are, by the Constitution, authorized to make the count of electoral votes. *They can only count legal votes, and in doing so must determine, from the best evidence to be had, what are legal votes ... The power to determine rests with the two houses, and there is no other constitutional tribunal*." *Bush v. Gore*, 531 U.S. 98, 154 (2000) (Souter, J., dissenting on other grounds) (*quoting* H.R. Rep. No.1638, 49th Cong., 1st Sess., 2 (1886) (emphasis added)).

Day are federal functions: "Presidential electors exercise *a federal function* in *balloting for President and Vice-President*[.]" *Ray v. Blair*, 343 U.S. 214, 224–25 (1952) (emphasis added); *Burroughs v. United States*, 290 U.S. 534, 545 (1934) (Presidential Electors "*exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States*") (emphasis added); *see also* Art. II, § 1; Amend. XII; 3 U.S.C. § 15.

### 2. *The Electoral Count Act of 1887*

Although the Constitution vests in Congress the exclusive authority to count and adjudicate Presidential Electors ballots and purported ballots after the citizens have voted and States have completed their constitutional role, *see* Amend. XII and 3 U.S.C. § 15, Congress ran into difficulty exercising that authority, largely because of the frequent submission of multiple ballots from States with no clear rules to guide Congress on adjudicating them. *See generally* Siegel at 578-584 (2004) (describing the turbulent elections preceding the passage of the ECA); Coenen & Larson at 860–68 (same). As a result of the chaos in these elections in the 1800s, particularly the Hayes-Tilden election in 1876, Congress passed the ECA in 1887 to set forth specific rules on how to exercise its constitutional authority to receive, adjudicate, and count presidential elector ballots from the States. *See* Siegel at 578-651; Coenen & Larson at 866-67. Among other things, Congress created in Section 5 of the ECA a limited opportunity for States to adjudicate Presidential Elector disputes in contested

elections.  *See* 3 U.S.C. § 5.  It also created specific rules governing how it would adjudicate multiple ballots and purported ballots from the same State.  *Id.* at § 15; Siegel at 625-34.

**ECA Safe Harbor.**  Section 5 of the ECA provided the States with a limited opportunity to settle post-election disputes over their Presidential Electors.   Under Section 5, if a State created an adjudicative body to resolve presidential elector disputes and that body issued a final decision at least six days before the date the ECA required Presidential Electors to cast their presidential ballots[7] (the "Safe Harbor" date), the State's final decision would be given conclusive effect by Congress when it met on January 6. *See* 3 U.S.C §§ 5, 15. Importantly, however, if a State *failed* to issue a final judicial decision of such disputes on or before this "Safe Harbor" deadline, its ability to decide who its valid presidential electors were was extinguished, and only Congress could resolve the remaining disputes. *See* 3 U.S.C. §§ 5, 15.  In accord with the ECA's provisions, Georgia instituted an adjudicative process to attempt to resolve disputes regarding Presidential Electors– a judicial contest.  *See* O.C.G.A. § 21-2-520 *et seq.*

---

[7] Section 7 of the ECA provides that "[t]he electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct."  In the December 2020 Election, this date was Monday, December 14, 2020, and so the Safe Harbor date was December 8, 2020.

**Contingently Elected Presidential Electors.** When an election of Presidential Electors is contested, as in the 2020 election, *neither* set of presidential electors are the *rightful or lawful* set of presidential electors from a State as a matter of law until one of two things occurs: (1) the State in which the election is contested issues a final judicial decision declaring one slate the winner on or before the ECA's Safe Harbor date (Dec. 8, 2020 in the 2020 election) pursuant to Section 5 of the ECA; *or* (2) Congress announces its determination as to the rightful slate on January 6. *See* Art. II, § 1; Amend. XII; 3 U.S.C. §§ 5, 15. *Nothing else* can or does settle this dispute as a matter of unambiguous federal law – not the State's certification of its vote totals or the Governor's certification (or re-certification) of one of the slates of Presidential Electors. *See* 3 U.S.C. §§ 5, 6, 15. Until one of these two events occurs in a contested election, then, *neither slate* of Presidential Electors is or can be the *lawful* or *rightful* slate *or* the *unlawful or fake slate* as a matter of plain federal law.

**Submission of Multiple Elector Slates to Congress.** The ECA is explicit that when Congress is performing its adjudicative role to settle disputes between competing or contingently elected Presidential Electors, the submission of *more than one presidential elector* ballot from a State is both expected and permissible. *See* 3 U.S.C. § 15. Indeed, much of Section 15 of the ECA is dedicated to how such

disputes will be adjudicated, and it references the submission of multiple ballots at least five times:

- "[A]ll the *certificates* and *papers purporting to be certificates of the electoral votes*, which *certificates and papers* shall be opened, presented, and acted upon . . . ."

- "When all objections so made to *any vote or paper from a State* shall have been received and read . . . ."

- "[T]he two Houses concurrently may reject *the vote or votes* when they agree that *such vote or votes* have not been so regularly given by electors"

- "If *more than one return or paper purporting to be a return from a State* shall have been received by the President of the Senate, . . . ."

- "[A]nd in *such case of more than one return or paper purporting to be a return from a State*, . . ."

3 U.S.C. § 15; *see also* Siegel at 625-34 (2004) (describing Congress' receipt and adjudication of multiple presidential elector ballots from one State); Coenen & Larson at 866-67 (same).

> [W]hile state and federal courts may play significant roles in shaping the dynamics of a dispute that reaches Congress, by declaring who is the lawful winner of the state's popular vote and which slate of presidential electors the state's governor must certify as authoritative, *ultimately neither the state nor federal judiciary can prevent a party's slate of presidential electors from purporting to meet on December 14 and acting as if they can cast the state's electoral votes--even if those individuals lack any indicia of authority under state law.* As long as these individuals do meet and do purport to send their electoral votes to the President of the Senate, *then even the intervention of the Supreme Court cannot stop a dispute regarding a state's electoral votes from reaching Congress.*

Edward B. Foley, *Preparing for A Disputed Presidential Election: An Exercise in Election Risk Assessment and Management*, 51 Loy. U. Chi. L.J. 309, 345 (2019) (emphasis added).

### B. Factual Background

#### 1. The 2020 Presidential Election.

In March of 2020, the Georgia Republican Party nominated David Shafer, Shawn Still, Cathy Latham and thirteen other Georgians as Presidential Electors for the 2020 presidential election, and the Republican nominees were certified to the Secretary of State. *See* Joint Appendix ("JA") Vol. 3, Tab DS-21-2, ¶ 6 (Declaration of William Bradley Carver ("Carver Decl.")). The general election was held on November 3, 2020. *Id.* at ¶ 7. On November 20, 2020, Georgia Secretary of State Brad Raffensperger and Governor Kemp certified the initial election results, which showed that Joe Biden won Georgia by a narrow margin. *Id.* On the same day, President Trump, pursuant to O.C.G.A. § 21-2-495, demanded a recount. *Id.*

On December 4, 2020, President Trump and Mr. Shafer, in his capacity as a Presidential Elector nominee and voter, filed a judicial contest to the election in the Superior Court of Fulton County pursuant to O.C.G.A. § 21-2-521, initiating *Trump et al. v. Raffensperger et al.*, Case No. 2020CV343255. *Id.* at ¶ 8. On December 7, 2020, Secretary Raffensperger and Governor Kemp re-certified the election for Joe

Biden following the State's recount. The second certification showed that Biden had won Georgia by an even smaller margin. *Id.* ¶ 9.

On December 9, 2020, the Superior Court of Fulton County issued an order that it would consider the election contest "in the normal course." *Id.* ¶ 10. On December 11, 2020, President Trump and Mr. Shafer filed an emergency petition with the Georgia Supreme Court, *Trump et al. v. Raffensperger et al.*, Case No. S21M0561, contending that the lower court would not provide timely relief before date the Presidential Electors had to cast their ballots under the ECA (December 14, 2020). *Id.* ¶ 11. On December 12, 2020, the Georgia Supreme Court denied the petition on procedural grounds. *Id* The election challenge remained pending in the Fulton Superior Court. *Id.* ¶ 15.

On December 14, 2020, Mr. Shafer, Mr. Still, Mrs. Latham and the other contingently elected Republican Presidential Electors met at the State Capitol. *Id.* ¶ 14. In the meeting, which was open to the public and the media, the Republican Presidential Electors then balloted for President and Vice President as required by the ECA. *Id.* ¶ 16; *see also* JA Vol. 4, Tab DS-27 at 3-4; *see also* JA Vol. 8, SS-31; JA Vol. 11, CL-26.

### 2. *The Fulton County District Attorney's Investigation and Prosecution of the Presidential Electors.*

On January 20, 2022, the Fulton County District Attorney sent a letter to the Chief Judge of the Fulton County Superior Court requesting that a special purpose

grand jury ("SPGJ") be impaneled to investigate possible attempts to disrupt the administration of the 2020 elections in Georgia. *See* JA Vol. 2, Tab DS-01 (Shafer Notice of Removal ("Shafer Notice") at Ex. G). The Superior Court issued an order authorizing the SPGJ, and the SPGJ was impaneled on May 2, 2022. The SPGJ investigated for nearly eight months, issuing subpoenas compelling the appearance of approximately 75 alleged witnesses. The SPGJ was dissolved on January 9, 2023.

On August 14, 2023, the District Attorney filed an indictment against former President Trump, the Presidential Elector defendants, and others. The indictment charges Appellants Shafer and Still with violation of the Georgia RICO Act (O.C.G.A. §16-14-4) (Count 1), Impersonating a Public Officer (O.C.G.A. § 16-10-23) (Count 8), two counts of Forgery in the First Degree (O.C.G.A. § 16-9-1) (Counts 10 and 16), two counts of False Statements (O.C.G.A. § 16-10-20) (Counts 12 and 18), and Criminal Attempt to File False Documents (O.C.G.A. § 16-4-1 and 16-10-20.1) (Count 14). *See* JA Vol. 1, Tab DS-01 (Shafer Notice at Ex. A). Mrs. Latham is also charged in Counts 1, 8, 10, 12, and 14, but not in Count 16 (one of the forgery counts) or Count 18 (one of the false statements allegations). *Id.*[8]

---

[8] Mr. Shafer alone is charged in Count 40, which is another False Statements allegation. *Id.* Only Mrs. Latham is charged in Counts 32-37, which address allegations of election and computer fraud in Coffee County. *Id.*

Page **13** of **57**

### 3. *Proceedings In The District Court and Appeal to This Court.*

All three Appellants filed notices of removal to federal court in the U.S. District Court for the Northern District of Georgia.[9]  Appellant Shafer also filed a request for habeas and/or injunctive relief as part of his notice.  On September 20, 2023, the Honorable Steve Jones held a consolidated hearing for the three Presidential Electors.[10]  On September 29, 2023, Judge Jones entered orders in each of the three cases[11] denying removal to federal court and remanding these cases to State court. [12]  All three Appellants timely appealed Judge Jones' orders to this Court.[13]  This Court consolidated the three appeals.

## SUMMARY OF THE ARGUMENT

Presidential Electors are created by the Constitution and are elected in federal elections to their federal office in which they perform the exclusively federal

---

[9] *See* JA Vol. I, Tab DS-01 (David Shafer); JA Vol. 5, Tab SS-01 (Shawn Still); JA Vol. 8, Tab CL-01 (Cathy Latham).

[10] *See* JA Vol. 2, Tab DS-09 (David Shafer); JA Vol. 7, Tab SS-13(Shawn Still); JA Vol. 10, Tab CL-10 (Cathy Latham).

[11] *See* JA Vol. 4, Tab DS-27 (David Shafer); JA Vol. 8, Tab SS-31 (Shawn Still); JA Vol. 11, Tab CL-26 (Cathy Latham)

[12] The Orders' reasoning in each of the three consolidated cases as to the Presidential Electors' status as federal officers and removal are the same.  For ease of reference, citations to the District Court's orders for purposes of this brief are specifically to the order (the "Order") issued in Appellant Shafer's case, JA Vol. 4, Tab DS-27, and the same points and principles apply in and for each Appellant.

[13] *See* JA Vol. 4, Tab DS-30 (David Shafer); JA Vol. 8, Tab SS-34 (Shawn Still); JA Vol. 11, Tab CL-29 (Cathy Latham).

function of meeting and balloting for President and Vice President. Like Members of Congress, they are federal officers entitled to removal of their State criminal case to federal court under the Removal Statute, 28 U.S.C. § 1442. Because Presidential Electors are created by the Constitution, States have no original or reserved powers over them: any authority that a State exercises over Presidential Electors, therefore, must be grounded in an express delegation of authority to the State by the Constitution.

The only express delegation of authority in the Constitution to the States with regard to Presidential Electors is Art. II, § 1's delegation to State legislatures to determine the manner of appointment of Presidential Electors. In Georgia, the legislature has set that manner of appointment as state-wide election by popular vote in federal elections every four years. Once the citizens have voted on Election Day, the State's constitutional authority over Presidential Electors is at an end, and everything that happens with regard to Presidential Electors thereafter is exclusively federal, governed by the Constitution and federal law. Specifically, Presidential Elector duties are mandated by the Constitution (Art. II, § 1 and Amend. XII) and the ECA (3 U.S.C. § 1 *et seq.*), and all disputes over a State's rightful Presidential Electors are constitutionally committed to Congress for resolution. Art. II, § 1; Amend. XII; *see also* 3 U.S.C. § 15. By statute (the ECA), Congress has granted States a limited window to decide post-Election Day disputes about Presidential

Electors, but only if the State issues a final judicial decision settling the dispute by the ECA's Safe Harbor date (six days before the date that the ECA requires Presidential Electors to meet and ballot for President and Vice President).[14] If a State does not issue a final judicial decision by the Safe Harbor date, as Georgia failed to do in the 2020 election, it has forfeited its opportunity under the ECA's Safe Harbor to participate in adjudicating the dispute about its Presidential Electors, and that dispute falls to Congress to resolve on January 6. 3 U.S.C. § 15.

In adjudicating this dispute, Congress is not bound by any other actions taken by the State with regard to the Presidential Electors. *Id.* Specifically, the State's certification of its vote is not binding on Congress, nor is any certification of the Presidential Electors by the Governor. *Id.* at §§ 6, 15.[15] While Congress certainly can *consider* such certifications in its adjudication, along with other relevant

---

[14] In the 2020 Election, the Safe Harbor date was December 8, 2020, and the date the Presidential Electors were required by the ECA to meet and ballot was December 14, 2020.

[15] The Governor's certification of the Presidential Electors can be used as a tiebreaker *at the end* of Congress' adjudication process on January 6 when multiple ballots are submitted, and the two houses cannot agree on which ballot is the lawful one. 3 U.S.C. § 15; *also* Siegel at 612 ("We will see that [the ECA] does, under certain circumstances, give the governor's certificate legal import. The point here is that historically the governor's certification had little or no effect on an electoral vote's validity and [the ECA] did not alter that tradition."); *id.* at 628-33 (describing governor's certificate as "fail safe"); Coenen & Larson at 866-67 (noting Governor certification only relevant as tiebreaker at the end of Congress' adjudication on January 6. But it has *no binding or conclusive weight prior* to that time.

evidence, such as the contingent presidential elector ballots submitted to Congress and any post-Safe Harbor judicial determination, none of these are conclusive or binding on Congress in adjudicating the dispute. *Id.* at § 15.

Here, the Presidential Electors are *not* indicted for anything relating to the manner of their *appointment* (in which State legislatures do have a constitutionally delegated role); they are indicted for actions they took post-Election Day to perform their duties as contingently elected Presidential Electors, which are mandated and governed exclusively by the Constitution and federal law.  Like Members of Congress, who are also created by the Constitution and elected by the States in federal elections to perform federal duties, Presidential Electors are federal officers for the broad purposes of the Removal Statute and entitled to removal of their case to federal court.[16]

The District Court also erred in declining to address Appellant Shafer's request for habeas and injunctive relief.  The Supreme Court and this Court's precedent is clear that such relief is appropriate and available when, as here, the State's criminal prosecution is facially preempted by the Constitution and federal law.  Indeed, it is exactly these types of situations – when the State is acting outside

---

[16] Additionally, as set forth in detail in Shafer's Notice of Removal and Request for Habeas and Injunctive Relief, the State's indictment as to the Presidential Electors is entirely barred by the Supremacy Clause and preempted by federal law.  *See* JA Vol. 1, Tab DS-01 (Shafer Notice) at pp. 30-50.

of its authority and in conflict with the Constitution and federal law – when federal courts must and do step in to prevent an ongoing but preventable unconstitutional deprivation of citizens' rights by a State criminal prosecution that is facially preempted by the Supremacy Clause and federal law (the ECA). Had the lower court considered these matters on their merits, as it should have, it would and should have granted the requested relief and obviated the need for that court (and this one) to decide these removal issues.

## STANDARD OF REVIEW

This Court reviews *de novo* review a district court's determination of jurisdiction and removal. *See Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 780–81 (11th Cir. 2005). A district court's denial of a request for habeas relief is also reviewed *de novo*. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010). For injunctions, this Court reviews "legal conclusions *de novo,* factual findings for clear error, and the ultimate decision to grant or deny the injunction for abuse of discretion." *Mesa Air Grp., Inc. v. Delta Air Lines, Inc.*, 573 F.3d 1124, 1128 (11th Cir. 2009) (internal citations omitted).

A district court abuses its discretion when "it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1301 (11th Cir. 2023) (citing *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d

767, 773–74 (11th Cir. 2015) (internal quotations omitted)).  "An error of law is an abuse of discretion *per se*." *Id.* (citing *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1153 (11th Cir. 2019) (internal quotation marks omitted)).

## <u>ARGUMENT</u>

The fundamental flaw in the District Court's conclusion that Presidential Electors (including contingently elected Presidential Electors) are not federal officers for purposes of the Removal Statute (Sections §§ 1442 and 1445) is its failure to recognize and give effect to the critical constitutional distinction between the authority under which Presidential Electors are *appointed* to their offices and the exclusively federal authority that governs the office to which they are elected.  The District Court correctly noted that the Electors Clause (Art. II, § 1) vests authority in State legislatures to decide the manner and means of *appointment* of presidential electors.  It failed to appreciate or apply, however, the constitutionally imposed boundaries of that appointment power and to separate it from the *exclusively federal constitutional authority* that presidential electors exercise when they perform the functions of the office to which they are elected.  The Order  also failed to consider that the resolution of disputes about a State's Presidential Elector slates in a contested election is committed by the Constitution exclusively to Congress, and the

States have *no* constitutionally granted right or authority in such disputes or any right to obstruct Congress in its resolution of them.[17]

Here, the State has indicted the Republican Presidential Electors *not* for anything relating to the manner and means of their *appointment* (in which State legislatures have a constitutional role) but instead for their actions in exercising their federal duty to *meet and ballot* for President and Vice President – duties that are explicitly imposed by the Constitution and federal law and that are exclusively *federal functions* that fall outside the States' appointment power. Combined with the breadth with which Congress drafted the Removal Statute and the dictates of the Supreme Court and this Court to apply it broadly and not "grudgingly," Presidential Electors (including contingently elected Presidential Electors) are federal officers performing federal duties when they meet and ballot. Because it is those actions for which they have been indicted by the State, Appellants are federal officers entitled to removal under the Removal Statute, and this Court should reverse the District Court.[18]

---

[17] As discussed herein, the ECA's Safe Harbor is created and governed by federal law (the ECA), not the Constitution or state law.

[18] A party seeking removal under Section 1442(a)(1) must satisfy a three-pronged test: (1) that they were a federal officer or acted under a federal officer; (2) that the actions for which they are being charged were performed under the color of that federal office or authority; and (3) that they have a colorable federal defense. *See Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (internal citations omitted). In its remand orders, the District Court determined that Appellants were not federal officers and declined to address the other two prongs. For the reasons

Additionally, the District Court improperly declined to address the merits of Mr. Shafer's request for pretrial habeas or injunctive relief based upon the Supremacy Clause and preemption. The lower court claimed that the *Younger* abstention doctrine applied, and that Mr. Shafer had not sufficiently addressed that doctrine to permit the court's pretrial intervention into State prosecution. This contention, however, is simply inaccurate on the face of the record and in the light of this Court's precedent. Because *Younger* abstention does *not apply* when, as here, a State's indictment is facially preempted by the Supremacy Clause and federal law, the court erred in declining to consider those claims on the merits and should be reversed.

## I.     The Federal Officer Removal Statute Applies to Former Federal Officers Like Presidential Electors.

For the 190-year history of the Removal Statute, 28 U.S.C. § 1442, federal courts, including the Supreme Court, have applied it to both current and former federal officers. As this Court has acknowledged, until its decision in *State v. Meadows*, Case No. 23-12958, Doc. 79 at p. 17 (11th Cir. Dec. 18, 2023), no court has ever before held that former federal officers were excluded from the provisions of Section 1442(a)(1) that permit individuals who are criminally charged or civilly

---

set forth in each Appellants' Notice of Removal and as established at the consolidated September 20, 2023 hearing before the District Court, Appellants satisfy all three prongs of the test for federal officer removal.

sued for actions that they took as federal officers to remove their cases to federal court.[19]  Neither the State nor the judge raised this issue in the District Court below in this or any of the related cases.

On January 2, 2024, Mr. Meadows filed a Petition for Rehearing En Banc, requesting that the full Eleventh Circuit hear and decide this issue.  As argued in greater detail in that Petition,[20] the panel decision regarding the Removal Statute's scope is inconsistent with the statute's text, its history, its purpose, and with existing precedent.  *See* Petition (Exhibit A) at 1-11.  The Appellants adopt the points and arguments made regarding the Removal Statute by Mr. Meadows in the Petition, and they join him in requesting that this Court reconsider its ruling on this matter.

While the ultimate resolution of this issue regarding the scope of the Removal Statute will be dispositive in Appellants' case with regard to removal to federal court pursuant to the Removal Statute, it does *not affect or otherwise dispose of* Mr. Shafer's separate request that the District Court assert jurisdiction under the pretrial Habeas Statute (28 U.S.C. § 2241) and/or under the court's equitable injunctive

---

[19] The Supreme Court held more than thirty years ago that federal immunity defenses protect former federal officers, *Nixon v. Fitzgerald*, 457 U.S. 731(1982), and the only federal court to have addressed this issue directly held the federal officer removal statute covers former federal officers as well as current ones. *See New York v. Trump*, No. 23 Civ. 3773 (AKH), 2023 WL 4614689, at *5 (S.D.N.Y. July 19, 2023).

[20] Meadows Petition for Rehearing En Banc is attached hereto as **Exhibit A**.

power.  Those claims remain viable regardless of the Removal Statute.  Indeed, if the panel's ruling on the Removal Statute remains the law in the Eleventh Circuit, the importance of these two alternative avenues of access to federal courts for former federal officers who are criminally charged by a state for actions they performed pursuant to the Constitution and federal law as federal officers takes on even greater urgency and significance.  Thus, regardless of this Court's ruling on the Removal Statute, it should reverse the District Court's ruling on the requested habeas and injunctive relief and remand for the District Court to consider those matters on their considerable merits.

## II.    **Presidential Electors Are Federal Officers for Purposes of the Removal Statute.**

Federal courts must construe Section 1442 broadly in favor of removal. *See Watson v. Phillip Morris Cos.*, 551 U.S. 142, 147 (2007) (the Removal Statute "must be liberally construed") (quotation omitted); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 741 (E.D. Pa. 2011) ("[T]he presumption under the federal officer removal statute favors removal."). "The federal officer removal statute is not 'narrow' or 'limited.'" *Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (citations omitted). "Congress has decided that federal officers, *and indeed the Federal Government itself*, require the protection of a federal forum. This policy should not be frustrated by a *narrow, grudging interpretation* of s

1442(a)(1)." *Id.* at 407 (emphasis added). "[T]he right of removal under s 1442(a)(1) is *made absolute whenever a suit in a state court is for any act 'under color' of federal office…." Id.* at 406 (emphasis added).

Despite recitation of these removal principles, the District Court applied precisely such a narrow and grudging interpretation of Section 1442 to deny the Presidential Electors removal. When the applicable law is properly applied, the Appellants are federal officers entitled to removal, and the Order should be reversed.

**A.    Because Presidential Electors Are Created By the Constitution And Elected By Ballot in Federal Elections to Perform Exclusively Federal Duties, They Are Federal Officers Entitled to Removal Under Section 1442.**

Presidential electors are created by the U.S. Constitution, elected by ballot in federal presidential elections,[21] and the duties they perform are mandated and governed exclusively by the Constitution and federal law. Only Congress has any constitutionally derived authority to adjudicate disputes over which slate of Presidential Electors has been appointed in contested elections. *See* Art. II, § 1 and Amend. XII; *Bush v. Gore*, 531 U.S. at 155 ("The power [of Congress] to judge of the legality of the [electoral] votes is a necessary consequent of the power to count. The existence of this power is of *absolute necessity to the preservation of the*

---

[21] *See, e.g.,* O.C.G.A. § 21-2-285 (explaining that when presidential electors are to be elected, the ballot lists the candidates for President and Vice President of the United States, not the presidential electors) (emphasis added)**.**

*Government.* The *interests of all the States in their relations to each other in the Federal Union demand that the ultimate tribunal to decide upon the election of President should be [Congress],* in which the States in their federal relationships and the people in their sovereign capacity should be represented.") (internal quotations and citations omitted)  (emphasis  added); *see also* Siegel at 578-651 (explaining Congress' authority under the ECA to adjudicate presidential elector disputes).[22] Under the Twelfth Amendment and the ECA**,** Congress has *sole authority* to receive, adjudicate, and count Presidential Elector ballots, specifically including returns *or papers purporting to be a return from a State*. *See* Amend. XII; 3 U.S.C. § 15; *Bush v. Gore,* 531 U.S. at 154**;** *see also* Siegel at 578-651 (explaining  Congress'

---

[22] The Order acknowledges the duty of Presidential Electors to elect the President and Vice President and that Presidential Electors perform exclusively federal functions.  *See* JA Vol. 4, Tab DS-27 at pp. 14-16.  But the Order then asserts that "there is nothing about these actions or the text of the Constitution that gives presidential electors authority or command over any federal activities," *id.* at 14, and that "the Constitution does not provide for any action that the presidential electors may undertake on behalf of the United States." *Id.* at 16.  These statements are inconsistent and simply wrong.  The Constitution *directly* and *unequivocally* gives Presidential Electors the duty to undertake one of the most important federal activities – electing the President and Vice President.  *See, e.g., Burroughs*, 290 U.S. at 545("[P]residential electors . . . exercise federal functions under, and *discharge duties in virtue of authority conferred by, the Constitution* of the United States. *The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated.*) (internal citation omitted) (emphasis added).

authority under the ECA to adjudicate presidential elector disputes including when Congress receives more than one ballot from a State).

Because Presidential Electors are created by the Constitution, the States have *no* original, reserved, or traditional police power over them. *See Term Limits*, 514 U.S. at 805 (noting the Tenth Amendment "could only 'reserve' that which existed before and that '*the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government,* which the constitution does not delegate to them. No state can say that it has reserved *what it never possessed*.'") (quoting 1 Story § 627) (emphasis added). State authority to regulate Presidential Electors (including through criminal indictment) "had to be delegated to, rather than reserved by, the States." *Id.* To justify exercising any authority over Presidential Electors, then, the State must articulate an express delegation of such authority given to it by the Constitution. It cannot.

As to Presidential Electors, the *only* express constitutional delegation of authority to the States is the power of State legislatures to choose the manner of their *appointment. See* U.S. Const. Art. II, § 1, cl. 2; Statement of the Case at A.1., *supra*. Once the citizens have voted for their choice of Presidential Electors on Election Day, the appointment power of the State is at an end, and State Constitutional authority over Presidential Electors ends. *See* Art. II, § 1; Amend. XII; 3 U.S.C. § 1**.** The duties that Presidential Electors perform and fulfill once elected (or contingently

elected)[23] to their offices are *exclusively* federal, *see* Art. II, § 1; Amend. XII; 3 U.S.C. § 15; *see also Ray*, 343 U.S. at 224–25; *Burroughs*, 290 U.S. at 545.

Because there is no *constitutional delegation* to the States to regulate the conduct of Presidential Electors *after* appointment – *i.e.*, in their meeting and balloting for President and Vice President -- or to adjudicate post-appointment disputes regarding who a State's rightful Presidential Electors are, such a power in the States simply "*does not exist.*" *See Term Limits*, 514 U.S. at 805; *cf. Cook v. Gralike*, 531 U.S. 510, 523 (2001) (emphasis added) ("By process of elimination, the States may regulate the incidents of such elections, including balloting, *only within the exclusive delegation of power*" by the Constitution.) Here, then, the Presidential Elector Appellants have been indicted for performing exclusively federal functions over which the State has *no authority or jurisdiction*. Removal to federal court, at a minimum, is required.

---

[23] *See* Statement of the Case at A.2, *supra*, explaining that when an election involving the election of presidential electors is contested, as was the case in the 2020 election, *neither* set of presidential electors are the *actual*, *rightful, or lawful* set of presidential electors from a State unless: (1) a Georgia court issues a final judicial decision that declares one slate the winner on or before the ECA's Safe Harbor date (which was Dec. 8, 2020 in the 2020 election); *or* (2) Congress announces its determination as to the rightful slate of presidential electors on January 6. *See* Art. II, § 1; Amend. XII; 3 U.S.C. §§ 5, 15.

1. *The District Court Erred In Relying On The State's Constitutional Appointment Power to Determine Presidential Electors Are Not Federal Officers.*

In light of these facts and constitutional structure, the District Court's reliance on the Electors Clause (Art. II, § 1), which gives State legislatures authority over the *appointment* of Presidential Electors, *see* JA Vol. 4, Tab DS-27 at 13-18, is wholly misplaced. It is undisputed that State legislatures have broad authority over the *appointment* of Presidential Electors under the Electors Clause, but this case has *nothing to do with the appointment of Presidential Electors* under that Clause. Instead, this case involves an election where there was an unresolved dispute as to Georgia's rightful presidential electors after Election Day – *i.e.,* after the State's constitutional appointment power was over. The State's only ability to participate in the Presidential Elector dispute at that point was through the statutorily given opportunity under the ECA's Safe Harbor, *see* 3 U.S.C. § 5; Statement of the Case at A.2., *supra*, which it failed to do in the 2020 election. As a result, this unresolved controversy was exclusively Congress's to resolve on January 6, 2021. *Id.*

Importantly, the indictment does not charge the Presidential Electors for anything related to their *appointment* under the Electors Clause but instead *only* for actions they took in *exercising their duties that are mandated and governed exclusively by the Constitution and federal law* that they performed after Election Day, *i.e.,* after the State's constitutional appointment power had terminated. As a

result, the appointment power given to the States by Art. II, § 1 has no bearing on whether Presidential Electors are federal officers once they are contingently or conclusively appointed on Election Day and thereafter, and the District Court's reliance on it to deny removal was error.[24]

> 2. *The District Court Erred In Relying On Supreme Court Dicta Regarding State Appointment Power Instead of More Recent Supreme Court Precedent Abrogating It.*

For the same reasons, the *dicta* from Supreme Court cases upon which the District Court relied[25] is also inapposite:  in each one, the Court was specifically addressing the State's *appointment power* for presidential electors, *not* the meeting and balloting of Presidential Electors once elected (or contingently elected) to their office *or* the resolution of disputes over Presidential Electors.  None of these

---

[24] Even if Presidential Electors were, in some senses, both state *and* federal officers, removal is nonetheless required. *See, e.g., Georgia v. Heinze,* 637 F. Supp. 3d 1316, 1322 (N.D. Ga. 2022) (removing case to federal court where removing party was both federal and state officer but acted in scope of his federal duties).

[25] In *Ray*, the Supreme Court upheld Alabama's requirement that Presidential Electors, *as part of their qualification for appointment*, must pledge to vote for the candidate of their respective political party who received the most votes for President and Vice-President. 343 U.S. at 225.  *McPherson* stands for the unremarkable proposition that State legislatures have the authority under the Electors Clause to change the manner in which the State appoints its Presidential Electors so long as the State's methods do not conflict with federal law.  146 U.S. 1, 42 (1892).  In *Burroughs*, the Court held that a federal criminal statute requiring disclosure of the amount received and expended by a voluntary political committee to influence election of presidential electors in two or more states was within Congress' power, not unconstitutional interference with a State's power to appoint Presidential Electors.  290 U.S. at 548.

decisions addressed whether Presidential Electors are federal officers for the broad purposes of the Removal Statute.

The District Court placed particular reliance on *In re Green*, 134 U.S. 377 (1890). *See* JA Vol. 4, Tab DS-27 at p. 12 n.6. But that case only tangentially involved presidential electors and did so in the context of a State's appointment power. There, a lower federal court had granted habeas relief to a Virginia citizen who was charged under state law with voting illegally because he was a convicted felon ineligible under Virginia law to vote. The Supreme Court reversed the grant of habeas, determining that Virginia had the authority to prosecute Virginia citizens for fraudulently voting for presidential electors because such authority was included in the State's constitutional appointment power. *Id.* at 379-80. This decision makes sense because *voting for* presidential electors by ballot is how they are *appointed*.

Additionally, even if the *dicta* in these cases involving the State's appointment power were relevant, which it is not, the Supreme Court has broken with this *dicta* in later decisions. In *Oregon v. Mitchell,* for example, the Court upheld Congress' right to set the voting age for *federal* elections, but not state or local elections. In reaching this conclusion, the majority specifically relied on the fact that *the election of presidential electors is a federal, not state, election*. 400 U.S. 112, 117-18 (1970).

Justice Harlan's dissenting opinion in *Mitchell*, which the Order cites in *support* of its conclusion, *see* JA Vol. 4, Tab DS-27 at p. 15, actually *defeats* it.

There, Justice Harlan cited *In re Green* and *Ray* in *dissenting* from the *majority's holding* that the selection of presidential electors is a *federal election*, noting that the majority's conclusion was inconsistent with the *dicta* in these prior decisions. As noted, the majority holding plainly walked back the language in *In re Green* and *Ray*, which is what sparked Justice Harlan's *dissent*. 400 U.S. at 212 n.89.[26]

In the more recent case of *US Term Limits, Inc. v. Thornton*, the Supreme Court broke even more sharply from its prior language suggesting that a State's authority over constitutionally created federal officers (such as Members of Congress and Presidential Electors) is derived from the States:

> [W]e have noted that *"[w]hile, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, ...* this ***statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject*** as provided by § 2 of Art. I." *United States v. Classic,* 313 U.S. 299, 315, 61 S. Ct. 1031, 1037, 85 L. Ed. 1368 (1941).

514 U.S. at 805 (emphasis added). Indeed, in *Term Limits*, the Court relied on the fact that Members of Congress (like Presidential Electors) were created by the Constitution in holding that States had *no* original, residual, or reserved powers over them under the Tenth Amendment. *Id.* at 800-805. As a result, States could only act

---

[26] Justice Rehnquist's concurrence in *Bush v. Gore*, also cited by the court, *see* JA Vol. 4, Tab DS-27 at p. 15, does not support the court's position. It quotes *Burroughs* to emphasize the federal importance of a federal presidential election, not for any point related to Presidential Electors as federal officers either generally or for purposes of the Removal Statute. *Id. (*citing *Bush v. Gore*, 531 U.S. at 112 (Rehnquist, J., concurring)).

with regard to Members of Congress (and by the Court's specific analogy, Presidential Electors)[27] to the extent that the Constitution expressly granted States such rights or authority. *Id.* Because the Constitution did not expressly grant States the right to set additional qualifications for Members of Congress, Arkansas' law attempting to set those qualifications was preempted by the Constitution. *Id.*

As applied to Presidential Electors, the appointment power given by the Constitution to the States does not give them any authority to adjudicate disputes regarding Presidential Electors or to otherwise regulate them in the performance of their constitutionally prescribed duties. Instead, Presidential Electors' duties are governed by the Constitution and the ECA, and the authority to decide such disputes belongs solely to Congress. Any State action with regard to these matters (including the State's Indictment) is unauthorized and preempted by the Constitution and federal law, not authorized by or within the State's appointment power. Because the actions for which the Presidential Electors have been indicted are controlled

---

[27] *See Term Limits*, 514 U.S. at 805 (stating that the duty for States to set the times, places, and manner of elections for Members of Congress under Art. I, § 4, cl. 1 *"parallels the duty under Article II"* that State legislatures choose the manner of Presidential Elector appointment and noting that *"[t]hese Clauses* are *express delegations of power to the States* to act with respect to federal elections. This conclusion is consistent with our previous recognition that, in certain limited contexts, the power to regulate the incidents of the federal system is *not a reserved power of the States*, but rather is *delegated by the Constitution.* ") (emphasis added).

exclusively by the Constitution and federal law, they are federal officers entitled to removal to federal court.

### 3. *Like the Members of Congress, Presidential Electors Are Federal Officers For Purposes of Removal.*

This constitutional structure as described in *Term Limits* is important to the federal officer analysis. Members of Congress are federal officers for purposes of the Removal Statute.[28] Although the Supreme Court itself analogized Members of Congress to Presidential Electors in *Term Limits*, 514 U.S. at 805,[29] the District Court inexplicably rejected this analogy.[30] But for the reasons the Supreme Court

---

[28] *See, e.g., Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995) (removing case under § 1442 and affirming quashal of state subpoenas issued to a Member of Congress); *Williams v. Brooks*, 945 F.2d 1322, 1324 n.2 (5th Cir. 1991) (explaining district court had removal jurisdiction over a state matter against a Member of Congress under § 1442(a)(1)); *Richards v. Harper*, 864 F.2d 85, 86 (9th Cir. 1988) (same); *Hill Parents Ass'n v. Giaimo*, 287 F. Supp. 98, 99 (D. Conn. 1968) ("A member of Congress is unquestionably an officer of the United States as this term is commonly used and must be considered as such pursuant to Section 1442(a)(1).")

[29] The Supreme Court has made this same comparison in other cases as well. *See, e.g., Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (noting that the Presidential Electors Clause of Article II was "a constitutional provision with *considerable similarity to the Elections Clause*[.]") (emphasis added); *Foster v. Love*, 522 U.S. 67, 69–70 (1997) (describing the Electors Clause as the "counterpart" of the Elections Clause).

[30] The Order also dismisses *Term Limits* as a non-removal case. *See* JA Vol. 4, Tab DS-27 at pp. 16-17. But none of the cases upon which the court relies are removal cases either. Indeed, there *are* no removal cases addressing Presidential Electors because no state authority has attempted to interfere with Presidential Electors' performance of their federal duties in their federal office or to usurp Congress' exclusive authority over these matters in the United States' 247-year history. In any

explained, the reasoning of *Term Limits* applies equally to Presidential Electors. *See Term Limits*, 514 U.S. at 805. Like Members of Congress, they are created by the Constitution, selected through state-wide election in federal elections, and perform their duties exclusively pursuant to the U.S. Constitution and federal law.

If Presidential Electors are not federal officers, at least for the broad purposes of removal, what are they? How could the Constitution give Congress sole and exclusive authority over them and their ballots, including the exclusive right to adjudicate competing ballots in a contested election, if the position to which they are elected is not a federal office? It could not. Nowhere does the Constitution give Congress any authority to adjudicate disputes over a *State* or non-federal office. Indeed, the only other relevant adjudicative power that Congress has under the Constitution is to adjudicate disputes about its own Members' elections. *See* Art. I., § 5, Cl. 1 ("Each House shall be the Judge of Elections, Returns and Qualifications of its own Members[.]")[31]

The relevant Supreme Court precedent, therefore, from *Burroughs* to *Term Limits*, establishes that for the same reasons that Members of Congress are federal

---

event, the application of the constitutional principles laid out in *Term Limits* apply by their own terms regardless of the context in which they arise.

[31] The fact that Congress is charged with the similar responsibility to adjudicate Presidential Elector disputes as it is disputes regarding its own membership under Art. I., § 5, Cl. 1 further supports that Presidential Electors are federal officers.

officers for purposes of Section 1442, so too, then, must be Presidential Electors.[32] Mr. Shafer, Senator Still, and Ms. Latham, therefore, are federal officers for the broad purposes of removal under Sections 1442 and 1445.

### B.    The District Court Erred In Relying On Other Portions of the Electors Clause to Deny Removal.

The Order also relies on other language in the Electors Clause to bolster its conclusion that Presidential Electors are not federal officers for purposes of removal. Because both of these sections upon which the Order relies relate to the inapplicable State appointment power, the court erred in relying on them.

The Order first notes that the Electors Clause prohibits current federal officers from serving as Presidential Electors. It seeks to transform this commonsense prohibition into evidence that Presidential Electors are not, themselves, federal officers. *See* JA Vol. 4, Tab DS-27 at pp. 13-14. In particular, based upon the Black's Law Dictionary definition of "officer", the Order posits that to be a federal officer, an individual must "hold[] an office of trust, authority, or command." *Id.* at 13. Because the Electors Clause excludes *current* federal officers from serving as

---

[32] The District Court also stated that the "purpose" of federal officer removal is not served by finding that Presidential Electors are federal officers. *See* JA Vol. 4, Tab DS-27 at pp. 18-19. According to the court, the purpose of Section 1442 is to protect those acting in the scope of their federal authority within the States when their actions are warranted by the federal authority they possess. *Id.* at 18 (quotations omitted). As established herein, however, that is *precisely what Presidential Electors do* – they act within the State pursuant to authority granted them by the Constitution to perform their federal duties –*i.e.*, meet and ballot for President.

Presidential Electors, the Order concludes that "[b]y design, therefore, presidential electors cannot be individuals who hold a place of trust or profit or authority from the United States and thus do not meet the office of trust category of being a federal officer." *Id.* at 14 (emphasis added).

As noted, this portion of the Electors Clause addresses the *appointment* of Presidential Electors, *i.e.,* who can and cannot be appointed to that office, which is not at issue under the facts of this indictment. Additionally, the Black's Law Dictionary's definition of officer is unnecessary to discern the word's meaning in Section 1442. Presidential Electors are nominated, put on the ballot, and elected to their office in a federal election by the popular vote by the citizens of Georgia just like Members of Congress. *See Mitchell,* 400 U.S. at 117-18 (election of presidential electors is a federal election)**.** Such persons are elected federal officials -- indeed, what else could they be? These facts, combined with the Supreme Court admonition that the term "federal officer" is to be construed broadly for purposes of the Removal Statute, *see Watson*, 551 U.S. at 147, render the Black's Law Dictionary definition inapplicable and irrelevant.

But even if this Court were to ignore those determinative facts, the fact that the Constitution prevents a currently serving federal officer from *also* concurrently serving as a federal Presidential Elector is at least consistent with Presidential Electors *also* being federal officers. Members of Congress are also prohibited by

the Constitution from serving in another federal office during their tenure in Congress, *see* Art. I, § 6, cl. 2,[33] but they are nonetheless federal officers for purposes of removal.  Thus, the Electors Clause's prohibition on currently serving federal officers from *also* serving in a second federal office as a Presidential Elector, is simply common sense and consistent with other similar provisions of the Constitution.  It is no indication that Presidential Electors themselves are not federal officers.  Indeed, the existing precedent and commentary on this issue indicates that there is perhaps no higher position of trust given to officers in the federal government than Presidential Electors except, perhaps, the President.  *See, e.g., Burroughs*, 290 U.S. at 545 ("[P]residential electors . . . exercise federal functions under, and *discharge duties in virtue of authority conferred by, the Constitution* of the United States. *The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated.*) (internal citation omitted) (emphasis added); *cf. United States v. Trump*, Case No. 1:23-CR-00257-TSC, ECF No. 1, ¶ 9 (D.D.C. Aug. 1, 2023) (describing the process "by which the results of the election for President of the United States are collected,

---

[33] "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."

counted, and certified" as a "federal government function" that is *"foundational to the United States' democratic process"*) (emphasis added).

Additionally, in attempting to distinguish *Term Limits* from this case, the Order attaches significance to the facts that the Electors Clause prohibits anyone from serving as a Presidential Elector who is paid by the U.S. Treasury and that Presidential Electors are eligible to receive a stipend from the State of Georgia. *See* JA Vol. 4, Tab DS-27 at p. 17. This portion of the Electors Clause, however, also addresses Presidential Elector appointment, which is not relevant to the context here. Further, as explained above, the fact that current federal officers (who are paid by the U.S. Treasury) cannot *also* serve as federal Presidential Electors supports, rather than detracts from, the fact that Presidential Electors are federal officers.

Also, the *Term Limits* holding is based upon the States having no original or residual powers over the qualifications of Members of Congress because those offices were created by the Constitution. *Term Limits*, 514 U.S. at 800–01. It mentions only in passing that Members of Congress receive salaries from the federal treasury as ancillary support for its primary constitutional premise; the Court in no way intimated that a federal salary was a necessary component of a federal office for any purpose, and certainly not for purposes of the Removal Statute.

Finally, the stipend that Presidential Electors are eligible to receive pursuant to O.C.G.A. § 21-2-13 is of no moment. That statute simply offers Presidential

Electors a small allowance pursuant to the State's appointment power, which, as established, has nothing do to with the activities for which the Presidential Electors are indicted here.

Thus, the Order's reliance on this inapposite and inapplicable language in the Electors Clause addressing the appointment of Presidential Electors was error. This State legislature's appointment power is not at issue here, and it in no way negates that Presidential Electors are elected to federal office and are entitled to removal.

**C.      In the 2020 Election In Georgia, Both Sets of Presidential Electors Were Contingently Elected, And Both Sets Were Federal Officers For Purposes of the Federal Removal Statute.**

The Order also rejected removal for the indicted Presidential Electors because they were "not yet (and never became) [] 2020 presidential elector[s] for the State of Georgia," and even if they were so-called contingent Presidential Electors, "contingent presidential electors are a creation of Georgia state law, not federal law" and "[t]here is no federal corollary that provides for contingent presidential electors." *See* JA Vol. 4, Tab DS-27 at p. 20. These statements and analysis fundamentally misstate and misapply the law to Presidential Electors, including contingently elected Electors.

First, as explained herein, the State's constitutionally delegated appointment power *ends* on Election Day, and at that point, all matters addressing Presidential Electors, including contingently elected Electors and the resolution of disputes

regarding the same, are within the sole constitutional jurisdiction of Congress. *See* Art. II, § 1; Amend. XII; 3 U.S.C. §§ 1, 15. Additionally, contingently elected Presidential Electors can only be and are created by *federal* law, *not* Georgia law. The Constitution and the ECA give Congress the exclusive authority to resolve these disputes, and *federal law* – not state law – governs the State's limited opportunity to participate in Presidential Elector disputes under the ECA's Safe Harbor provision in Section 5. *See* 3 U.S.C. §§ 5, 15; *see also* Statement of the Case at A.2., *supra*. When there is a dispute after an election regarding a State's rightful Presidential Electors, *both sets* of Presidential Electors are contingently elected as a matter of constitutional and federal law until this dispute is resolved. *See* 3 U.S.C. §§ 5, 15; *see also* Statement of the Case at A.2., *supra*. That resolution happens in one of two ways, both of which are controlled by federal law.

In the first, Section 5 of the ECA gives States a limited opportunity to settle Presidential Elector disputes if the State can render a *final judicial decision*[34] on that issue by the ECA's Safe Harbor date in Section 5. *See* 3 U.S.C §§ 5, 15; *see also* Statement of the Case at A.2, *supra*. But, when a State *fails* to issue a final decision on or before this "Safe Harbor" deadline (as Georgia failed to do in 2020), its

---

[34] As explained herein, Georgia's adjudicative process for purposes of Section 5 of the ECA is a judicial contest. O.C.G.A. § 21-2-520 *et seq*.

opportunity to adjudicate the Presidential Elector dispute is forfeit. At that point, only Congress can resolve the dispute when it adjudicates the ballots on January 6. *See* 3 U.S.C. §§ 5, 15; Siegel at 613-34.

In this circumstance, *neither set* of Presidential Electors is conclusively elected until January 6, and *both sets* of Presidential Electors *remain contingently elected* until Congress settles that matter on January 6 *as a matter of the Constitution and federal law (the ECA)*, *not* as a result of any state law. 3 U.S.C. § 15; Siegel, 613-34. *All* of these processes post-Election Day are governed by *federal* law (the Constitution and the ECA), and the state law process that is invoked is only pursuant to (and restrained by) the limited authority given to the state *by the ECA*.

Applying these provisions to the 2020 election in Georgia, the Presidential Electors were nominated by their respective political parties in March of 2020 and placed on the ballots for the November 2020 election. The citizens of Georgia voted on November 3, 2020. At that point, the State of Georgia's *constitutionally* prescribed role over the appointment of Presidential Electors *was at an end*, and all *constitutional* authority over Presidential Electors actions and their ballots, including any disputes regarding the same, belonged to solely Congress. *See* Amend. XII and 3 U.S.C. §§ 1, 5, 15**.**

Had the court in *Trump et al. v. Raffensperger et al.*, Case No. 2020CV343255 (Fulton County Super. Ct. 2020) issued a *final decision* in that case

on or before December 8, 2020 (the ECA's Safe Harbor date), then that decision would have been conclusive on Congress in counting ballots on January 6, 2021. It would have settled the dispute over presidential electors for Georgia. *See* 3 U.S.C. §§ 5, 15. That judicial challenge, however, did *not* produce a final decision on or before the ECA's Safe Harbor date of December 8, 2020. Indeed, no hearing or other proceeding was ever had in that case. As a result, Georgia *did not meet the ECA's Safe Harbor*, it forfeited its opportunity under the ECA to decide the dispute, and the dispute, therefore, fell exclusively to Congress to resolve on January 6 as a matter of constitutional law and the ECA. *See* Amend. XII; 3 U.S.C. §§ 5, 15**.**

While the State of Georgia and its citizens could submit evidence to Congress to consider in its adjudication of the dispute, including multiple ballots from purported or contingent presidential electors (3 U.S.C. § 15), the Governor's certificate of ascertainment (3 U.S.C. §§ 6, 15), or even a post-Safe Harbor judicial decision, the State no longer had any authority or ability to make a conclusive determination for Congress about that dispute because it failed to meet the ECA's Safe Harbor provisions. *See* 3 U.S.C. § 15**.** At that point, *neither set* of Presidential Electors was conclusively elected as a matter of law, and *both sets* of Presidential Electors *remained contingently elected* until Congress settled that matter on

January 6, 2021 as a matter of pure federal law. *See* 3 U.S.C. § 15; Siegel at 613-34.

Despite these unambiguous provisions of the Constitution and the ECA, however, the State claims that the Biden Presidential Electors were conclusively and finally elected when the Governor of Georgia certified (and re-certified) them as the State's Presidential Elector. *See generally* Indictment, JA Vol. 1, Tab DS-01 at Ex. A; *see also* JA Vol. 2, Tab DS-07 at pp. 2-3, 6-7, 11-12. Without citation to any relevant authority or reconciling the direct conflict between this concocted position and the express provisions of the ECA, the State then decrees that the Republican Presidential Electors who were *not* certified by the Governor to be unlawful, false, and fraudulent and, therefore, guilty of crimes in exercising their Presidential Elector duties. *See generally* Indictment, JA Vol. 1, Tab DS-01 at Ex. A; *see also* JA Vol. 2, Tab DS-07 (State Response) at pp. 2-3, 6-7, 11-12.

Problematically for the State, the ECA is clear that once the State misses its Safe Harbor date (as Georgia did in 2020), the unresolved dispute over Presidential Electors is committed solely to Congress, which has specifically authorized the submission of both presidential elector ballots and purported ballots to it to adjudicate those disputes. *See* 3 U.S.C. §§ 5, 15; Siegel at 613-34. The ECA is equally clear that a Governor's certification of a particular slate of Presidential Electors has *no binding effect on Congress whatsoever* in its adjudication of this

dispute. *See* 3 U.S.C. §§ 5, 6, 15; *also* Siegel at 612 ("We will see that [the ECA] does, under certain circumstances, give the governor's certificate legal import. The point here is that historically the governor's certification had little or no effect on an electoral vote's validity and [the ECA] did not alter that tradition."); *id.* at 628-33 (describing governor's certificate as "fail safe"); Coenen & Larson at 866-67 (noting Governor certification only relevant as tiebreaker at the end of Congress' adjudication on January 6).[35]

Once the State misses that Safe Harbor date, as Georgia did in 2020, *nothing* that the State does or submits is binding on Congress in adjudicating between two or more competing Presidential Elector ballots on January 6. *See* 3 U.S.C. §§ 5, 15; Siegel at 613-34; Coenen & Larson at 866-67. Congress will receive and weigh for itself whatever evidence is submitted to it for that purpose, including multiple elector ballots and papers purporting to be elector ballots (as ECA Section 15 makes clear), the Governor's certification(s) (Section 6 of the ECA), and any post-Safe Harbor judicial determination. But it is not *bound* by *any* of those in making

---

[35] The Governor's certification *can* come into play in Congress as a tiebreaker, but *only* at the *end* of the adjudication process by Congress *on January 6* if the two houses cannot agree on which slate of Presidential Electors is the lawful one. It has *no legal weight or binding effect prior to that time* in a contested election with two or more slates of Presidential Electors. *See* 3 U.S.C § 15; *see also* Siegel at 612-34. It cannot be used, therefore, to declare one set of Presidential Electors the proper or lawful ones for a State before Congress' adjudication on January 6.

its decision once the Safe Harbor date has passed.  *See* 3 U.S.C. §§ 5, 6, 15; *see also* Siegel at 612, 628-33.

So, despite the fact that the Biden Presidential Electors had the Governor's certification in 2020, *neither* slate of Presidential Electors had any superior legal standing to the other in Congress' adjudication of the dispute under the plain terms of the ECA.  *See* 3 U.S.C. §§ 5, 15; *see also* Siegel at 612-34.  As a result, the State's attempt to declare as legally conclusive the Biden slate certified by the Governor and to use that false premise to criminalize all actions taken by the non-certified set of Presidential Electors is directly contrary to the Constitution and openly defies and obstructs the express provisions of the ECA.

That the District Court also misunderstood and misapplied these relevant provisions of constitutional and federal law is made clear by its incorrect assertion that "[t]here is no federal corollary that provides for contingent presidential electors."  *See* JA Vol. 4, Tab DS-27 at p. 20.  To the contrary, as outlined herein, the Constitution and the ECA specifically create this very contingent structure. Indeed, the ECA itself directly addresses how Congress will resolve disputes between two or more competing presidential elector ballots (i.e., contingently elected presidential electors) at least five separate times.  *See* 3 U.S.C § 15; *see also* Siegel at 613-34; Statement of the Case at A.2, *supra*.

In sum, everything that happens with regard to Presidential Electors after Election Day – including the resolution of disputes about Presidential Electors -- is governed by the Constitution and federal, not state, law.  Even the ECA's Safe Harbor is created by and governed by federal law.  As such, the Presidential Electors are federal officers entitled to removal.

## III.    The District Court Erred In Declining to Consider Mr. Shafer's Request for Habeas and Injunctive Relief.[36]

The Supremacy Clause ousts States from interfering with exclusively federal functions, including through indictment. When State authorities nonetheless pursue criminal indictments that interfere with or obstruct areas of exclusive federal authority, federal courts are empowered to protect federal sovereignty from such improper indictments through the Writ of Habeas Corpus, 28 U.S.C. § 2241 (the "Habeas Statute")[37] or by exercise of its equitable authority through injunction or

---

[36] In its order, the District Court declined to certify the habeas and injunctive relief question for appeal.  Under the Supreme Court's decision in *BP P.L.C.*, 141 S. Ct. at 1542-43, no such certification is necessary.  In *BP*, the Supreme Court noted that permitting broad review of remand orders would serve efficiency and clarified that appeals pursuant to Section 1447(d) encompass the district court's entire remand order.  *Id.* at 1542.  The habeas and injunctive relief requests are addressed in the Court's remand order.

[37] *See, e.g., Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 508 (1973) (Rehnquist, J., dissenting) (citing *Wildenhus's Case*, 120 U.S. 1 (1887); *In re Loney*, 134 U.S. 372 (1890); *In re Neagle*, 135 U.S. 1). Such pre-trial federal relief is also available when the State attempts to criminalize actions that interfere with the authority and operations of the federal government. *See In re Loney,* 134 U.S. 372 (1890) (granting pretrial habeas relief to regular citizen, not federal officer, charged with perjury under Virginia criminal laws where Virginia was barred by

declaratory relief.[38]

### A. The District Court Erred As A Matter of Law In Declining to Consider Mr. Shafer's Request for Habeas Relief On The Merits Based Upon Its Incorrect Application of *Younger* Abstention Principles.

"Federal courts have a virtually unflagging obligation ... to exercise the jurisdiction given to them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* at 813.   "[A]bstention must be justified by weighty concerns of comity and judicial administration, and even then abstention should not be ordered without a careful balancing of those concerns against concerns favoring the

---

the Supremacy Clause from charging under state criminal law because he was testifying pursuant to federal law about a matter exclusively within the purview of Congress and, therefore, of the federal government); *U.S. ex rel. Noia v. Fay*, 300 F.2d 345, 354-55 (2d Cir. 1962), *aff'd sub nom. Fay v. Noia*, 83 S. Ct. 822 (1963) (noting Supreme Court has upheld issuance of pre-trial federal writ in State prosecutions where the State court had "no jurisdiction to entertain an action so inseparably connected with the functioning of the National Government"), *abrogated on other grounds by Wainwright v. Sykes*, 433 U.S. 72, 85, 97 S. Ct. 2497, 2505, 53 L. Ed. 2d 594 (1977); *cf. People of State of New York v. Eno*, 155 U.S. 89, 94 (1894) ("When the petitioner is in custody by State authority *for an act done or omitted to be done in pursuance of a law of the United States…* the courts of the United States have *frequently interposed by writs of habeas corpus and discharged prisoners* who were held in custody under state authority") (quoting *Ex parte Royall*, 117 U.S. 241, 252 (1886) (emphasis added)).

[38] If jurisdiction were asserted over this case under the pretrial habeas statute or the court's injunctive power, determination of the issues regarding the Removal Statute would not be necessary.

exercise of federal jurisdiction." *Murray v. Carrier*, 477 U.S. 478, 518–19 (1986) (Brennan, J. dissenting on other grounds) (citations omitted); *Doran v. Salem Inn, Inc.,* 422 U.S. 922 (1975)).

In refusing to consider Mr. Shafer's request for habeas relief, the lower court did not acknowledge or address these important admonitions regarding assertion of jurisdiction and instead opined that Mr. Shafer had not satisfied the *Younger* abstention hurdles to that relief. *See* JA Vol. 4, Tab DS-27 at p. 32.[39]

---

[39] *Younger* abstention requires that absent extraordinary circumstances, a federal court should not enjoin a state court prosecution. *Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1262–63 (11th Cir. 2004). The State's lack of authority and jurisdiction to bring or pursue an indictment are considered such "extraordinary circumstances." *See, e.g.,* Footnote 39. Additionally, *Younger* abstention, by its own terms, only applies to claims for injunctive or declaratory relief, not to habeas claims, and the Supreme Court has not applied *Younger* abstention principles in the habeas context. *See, e.g., Fair Assessment in Real Est. Ass'n, Inc. v. McNary*, 454 U.S. 100, 122 (1981) ("Abstention" is often cited as an application of the comity principle. *Not surprisingly then, we have applied the abstention doctrine only in equity actions.*") (emphasis added) (internal citations omitted). Instead, the Supreme Court has applied habeas exhaustion principles in the habeas context and labeled this exhaustion doctrine as its own "abstention" doctrine. *Fay v. Noia*, 372 U.S. 391, 419 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977), *abrogated on other grounds by Coleman v. Thompson*, 501 U.S. 722 (1991); *see also Murray*, 477 U.S. at 518 n.1 (noting important difference between "abstention in the habeas context and in other contexts."). Nonetheless, the former Fifth Circuit, in in *Kolski v. Watkins*, 544 F.2d 762, 766 (5th Cir. 1977) -- a decision that is binding in this Circuit – grafted the requirements of *Younger* into the habeas context. Thus, although the applicable law and statutes do not actually require or allow the application of the *Younger* abstention principles in addition to the habeas exhaustion principles to be imposed before pretrial habeas relief can be granted, that is currently the law in this Circuit absent an *en banc* or Supreme Court decision correcting this error. Even so, this Court made clear in *Hughes* itself that *Younger* abstention does *not* apply where, as here, the State's action is facially preempted.

The court acknowledged that Mr. Shafer argued that *Younger* does not apply "to claims that federal authority immunizes an individual, like Shafer, from state prosecution," *id.* at 33, but then dismissed the Supreme Court authority cited for that proposition because it was not criminal or habeas case. *Id.* The Order, however, misses the mark.

>1. *Younger Abstention Does Not Apply In Cases Like This One, Where Federal Preemption Is Facially Conclusive.*

This Court's precedent is clear on this point. Indeed, one of the cases that the District Court cites – *Hughes v. Att'y Gen. of Fla* -- stands for this *very* proposition. 377 F.3d 1258, 1265 (11th Cir. 2004) (courts do not abstain under *Younger* when federal preemption is facially conclusive).

Here, Mr. Shafer's request for habeas and injunctive relief overwhelmingly established that the State's indictment is facially and conclusively preempted by the Constitution and federal law. *See* JA Vol. 1, Tab DS-01 at pp. 30-50. Specifically, Mr. Shafer established that that the State's indictment of the Presidential Electors is barred by the Supremacy Clause and *also* preempted under *both types* of conflict preemption and *both types* of field preemption.

As to the Supremacy Clause and as discussed in more detail above, the Constitution creates Presidential Electors and vests the States only with the authority for their legislatures to set the manner of their appointment. *See Term Limits,* 514 U.S. at 805; *see also* Statement of the Case at A.1. and Section II.A., *supra.*

"[T]he Framers intended the Constitution to be the *exclusive source*" of authority over officer, like Presidential Electors, which are created by the Constitution, and they "divested" States of *any power* with regard to them that is not *expressly granted* to them in the Constitution. *Term Limits,* 514 U.S. at 800–01; *see also* Statement of the Case at A.1. and Section II.A., *supra*.[20] Because the State here is not and cannot be acting pursuant to the power granted by the Constitution to the Georgia state legislature to set the manner of appointment of Presidential Electors, it is divested of any authority over them, and its indictment is preempted under the Supremacy Clause. *See also* JA Vol. 1, Tab DS-01 (Shafer Notice) at pp. 35-36.

Mr. Shafer also established that the State's indictment is facially and conclusively preempted under both types of federal conflict preemption because (1) it makes it impossible to comply with both federal and state law, and (2) the attempted application of state law in the indictment obstructs the execution of Congress' purposes and objectives. *See* JA Vol. 1, Tab DS-01 at (Shafer Notice) at pp. 39-40. First, the indictment makes compliance with both Georgia law (as applied by the State here) and federal law, the ECA. As noted, the ECA specifically permits the submission of both presidential elector ballots and "purported" or contingent presidential elector ballots to Congress for its adjudication. 3 U.S.C. § 15. The State's indictment, however, criminalizes the submission of contingent or "purported" presidential elector ballots to Congress. *See* JA Vol. 1, Tab DS-01 at

Ex. A, pp. 13-17, 20, 28, 31-32, 35-42, 76-81. Under the State's application of state law in its indictment, Mr. Shafer could not take the necessary steps to both execute a contingent or purported presidential elector ballot (as he was plainly entitled to do under the ECA) and also comply with the State's attempted application of its criminal laws. The State's indictment conflicts with the plain language of the ECA, and it is preempted.

Conflict preemption also applies because criminalizing the submission of contingent or "purported electoral ballots to Congress as is specifically anticipated by the ECA facially obstructs Congress' objectives and purposes expressed in the ECA. The ECA is explicit that Congress is to receive *both* presidential elector ballots *and contingent or purported presidential electoral ballots* so that it can exercise its exclusive constitutional authority to adjudicate the valid, lawful ballots. *See* JA Vol. 1, Tab DS-01 at 39-40; 3 U.S.C. § 15; *see also* Statement of the Case at A.2. and Section II.A., *supra*. When a State attempts to criminalize the submission of these ballots and purported ballots, as the State has done here, it plainly and directly obstructs Congress' objectives and purposes (indeed, its exclusive authority) under the ECA – Congress obviously cannot adjudicate what the State improperly precludes it from even receiving. *See* JA Vol. 1, Tab DS-01 at 39-40.

Finally, Mr. Shafer established that both types of field preemption apply here as well because (1) Congress, through its exclusive constitutional authority and the

ECA, has completely occupied the field of regulating Presidential Electors when they meet and cast their ballots and (2) because the federal interest is so dominant that enforcement of state laws is precluded. *See* JA Vol. 1, Tab DS-01 at 36-39. First, the Constitution vests solely Congress with the authority to receive and adjudicate presidential elector ballots and purported ballots, and states have no constitutionally assigned role in this process. *Id.*; Statement of the Case at A.1.-2. and Section II.A., *supra*. Additionally, Congress has exercised its authority through the ECA, and its regulation of and over the casting, collection, adjudication, and counting of presidential elector ballots and purported presidential elector ballots is comprehensive. Indeed, the ECA has been described as so "detailed" and "comprehensive" that even federal courts would be divested of jurisdiction to interfere with Congress' authority to adjudicate and count presidential elector ballots. *Bush v. Gore*, 531 U.S. at 155 (2000); *see also* JA Vol. 1, Tab DS-01 at 36-39; Siegel at 625-34 (describing in detail the comprehensive provisions of the ECA, their application, and their legislative history). Through the ECA, then, Congress has comprehensively occupied the field in presidential elector (*and contingent presidential elector*) balloting and adjudication, and the States have no authority under the ECA to inject themselves into this process. *See* JA Vol. 1, Tab DS-01 at 36-39.

Additionally, field preemption also applies because the federal interest here is so dominant that the exclusion of any state law must be presumed. *Id.* As noted, *only* the federal government has any interest in Presidential Electors meeting and balloting; States are given no role in these matters by the Constitution and are, therefore, divested of any authority to insert themselves into it. *Term Limits*, 514 U.S. 800-01, 805; JA Vol. 1, Tab DS-01 at 36-39; Section II.A., *supra*.

> The power [of Congress] to judge of the legality of the [electoral] votes is a necessary consequent of the power to count. The existence of this power is of *absolute necessity to the preservation of the Government*. The *interests of all the States in their relations to each other in the Federal Union demand that the ultimate tribunal to decide upon the election of President should be [Congress],* in which the States in their federal relationships and the people in their sovereign capacity should be represented.

*Bush v. Gore*, 531 U.S. at 155 (internal quotations and citations omitted) (emphasis added); *see also Burroughs,* 290 U.S. at 545 ("[P]residential electors . . . exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States. *The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated.*) (internal citation omitted) (emphasis added); *see also In re Loney*, 134 U.S. at 376 (1890) (holding states cannot use state criminal laws to interfere with Congress' adjudication of a dispute over who was

the correct Congressman to be seated because that function is so inseparably connected to the functioning of the national government).

In sum, Mr. Shafer conclusively established that the State's indictment was facially preempted, which renders *Younger* abstention inapplicable under this Court's precedent.  *See* JA Vol. 1, Tab DS-01 at pp. 30-50.  The District Court, however, ignored these dispositive facts to improperly avoid addressing the merits of the requested habeas and injunctive relief.

> **2.** *The District Court Improperly Disregarded Applicable Supreme Court Precedent.*

The District Court also attempted to distinguish and disregard specific Supreme Court precedent authorizing the requested relief under these circumstances.  For example, the Order dismisses the Supreme Court's holding in *Armstrong*, 575 U.S. at 326 that "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted" because *Armstrong* was not a criminal or habeas case.  But the case that *Armstrong* itself cited for this *very proposition* was a *criminal habeas case -- Ex parte Young*.  *See Armstrong*, 575 U.S. at 326 (citing *Ex parte Young,* 209 U.S. 123, 155–156 (1908)).  Obviously, the Supreme Court saw no meaningful distinction in the application of this principle in the administrative context of *Armstrong* and the criminal habeas context in *Ex parte*

*Young*.  As such, the *Armstrong* principle applies with equal force in *this* criminal habeas case, and the lower court erred in attempting to distinguish it.

In short, the District Court erred as a matter of law in declining to address Mr. Shafer's request for habeas relief on the merits, and this Court should reverse and remand.

### B.    The District Court Also Erred in Declining to Consider Mr. Shafer's Request for Injunctive Relief on the Merits.

The District Court also declined to address the requested injunctive relief because "Shafer does not assert any statute or legal basis for his request for equitable relief" and therefore "Shafer has not met his burden in establishing the method upon which the Court may travel to award equitable relief."  *See* JA Vol. 4, Tab DS-27 at p. 35.  Again, this determination is belied by the record and misstates the law.

Appellant Shafer supported his argument and requested relief with citation to examples of other federal courts, including this Court and the Supreme Court, exercising their equitable power in exactly the manner that Appellant Shafer requested.  *See* JA Vol. 3, DS-14 at pp. 13-14 (citing *Armstrong*, 575 U.S. at 326 ("[I]f an individual claims federal law immunizes him from state regulation, *the court may issue an injunction* upon finding the *state regulatory actions preempted*.") (emphasis added) and *Smith v. Meese*, 821 F.2d 1484, 1491 (11th Cir. 1987) ("In light of *United States v. McLeod,* approving a broad injunction against unconstitutional pattern of state prosecutions, and cases such as *Fitzgerald v. Peek*

and *Wilson v. Thompson,* enjoining specific state prosecutions, *it is clear that the federal courts have both the jurisdiction and competence to enjoin unconstitutional prosecutorial decisionmaking of state officials."*) (emphasis added)).

Additionally, as Justice Scalia made clear in *Armstrong*, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England. It is a judge-made remedy[.]" 575 U.S. at 327. "What our cases demonstrate is that, 'in a proper case, relief may be given in a court of equity ... to prevent an injurious act by a public officer." *Id.* (citations omitted); *see also Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1946–47 (2020) ("[I]t is well-established that federal courts have 'inherent equitable powers' that are 'available for the proper and complete exercise' of their jurisdiction.") (citations omitted). In short, the District Court's proffered reason for declining to exercise equitable jurisdiction is refuted by the record and by precedent from the Supreme Court and this Court. It should also be reversed.

## CONCLUSION

For all the reasons set forth herein, the decision of the lower court should be reversed.

Respectfully submitted this the 18th day of January, 2024.

/s/ Craig A. Gillen

Craig A. Gillen
Georgia Bar No. 294838
Anthony C. Lake
Georgia Bar No. 431149
GILLEN & LAKE LLC
400 Galleria Parkway, Suite 1920
Atlanta, Georgia 30339
(404) 842-9700
cgillen@gwllawfirm.com

/s/ Holly A. Pierson

Holly A. Pierson
Georgia Bar No. 579655
PIERSON LAW LLC
171 17th Street, Suite 1550
Atlanta, GA 30363
(404) 353-2316
hpierson@piersonlawllc.com

*Counsel for Appellant David J. Shafer*

/s/ Thomas D. Bever

Thomas D. Bever
Georgia Bar No. 055874
W. Cole McFerren
Georgia Bar No. 409248
SMITH, GAMBRELL & RUSSELL, LLP
1105 W. Peachtree Street, N.E. Suite 1000
Atlanta, GA 30309
(404) 815-3500
tbever@sgrlaw.com
cmcferren@sgrlaw.com

*Counsel for Appellant Shawn Still*

/s/ William G. Cromwell

William G. Cromwell
Georgia Bar No. 197240
CROMWELL LAW, LLC
400 Galleria Parkway, Suite 1920
Atlanta, GA 30339
(678) 384-5626
bcromwell@cartercromwell.com

*Counsel for Appellant Cathleen Latham*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing Appellants' Joint Brief complies with the Federal Rules of Appellate Procedure and this Court's Rules, including Rule 32(a)(7)'s type volume limit because, excluding the portions of the brief that do not count toward the type volume limit, this Joint Brief contains 14,191 words.[1]

This the 18th day of January, 2024.

/s/ Holly A. Pierson
Holly A. Pierson
Georgia Bar No. 579655
Counsel for David J. Shafer

/s/ Thomas D. Bever
Thomas D. Bever
Georgia Bar No. 055874
Counsel for Defendant Shawn Still

/s/ William G. Cromwell
William G. Cromwell
Georgia Bar No. 197240
Counsel for Appellant Cathleen Latham

---

[1] On January 10, 2024, Appellants filed a motion to file its Joint Brief in excess of the 13,000 word limit, requesting that the limit be extended to 15,000 words. That motion has not yet been decided. Should the Court deny the motion, Appellants request the opportunity to submit a conforming corrected Joint Brief.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the date set forth below, a true and accurate copy of the foregoing Appellants' Joint Appendix filed electronically with the U.S. Court of Appeals for the Eleventh Circuit through the Court's ECF system, which will send notice of this filing to all counsel of record.

This the 18th day of January, 2024.

*/s/ Holly A. Pierson*
Holly A. Pierson
Georgia Bar No. 579655
*Counsel for David J. Shafer*

*/s/ Thomas D. Bever*
Thomas D. Bever
Georgia Bar No. 055874
*Counsel for Defendant Shawn Still*

*/s/ William G. Cromwell*
William G. Cromwell
Georgia Bar No. 197240
*Counsel for Appellant Cathleen Latham*

# Exhibit A

No. 23-12958

---

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

THE STATE OF GEORGIA,

*Plaintiff-Appellee*,

v.

MARK RANDALL MEADOWS,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the Northern District of Georgia,
No. 23-cv-03621

_____

## PETITION FOR REHEARING EN BANC
_____

GEORGE J. TERWILLIGER, III
TERWILLIGER LAW PLLC
PO Box 74
Delaplane, VA 20144

JOHN S. MORAN
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006

PAUL D. CLEMENT
ERIN E. MURPHY
ZACHARY J. LUSTBADER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Defendant-Appellant*

January 2, 2024

No. 23-12958, *Georgia v. Meadows*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

To the best of Appellant's knowledge, no associations of persons, partnerships, or corporations have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock; the following is a list, in alphabetical order, of all trial judges, attorneys, law firms, and persons with such an interest[*]:

1.  Alksne, Cynthia, *amicus* below

2.  Anulewicz, Christopher Scott, attorney for Robert David Cheeley

3.  Arora, Manubir, attorney for Kenneth John Chesebro

4.  Aul, Francis, attorney for Mark R. Meadows

5.  Ayer, Donald B., *amicus* below

6.  Barron, Lynsey M., attorney for Scott Graham Hall

7.  Beckermann, Wayne R., attorney for Robert David Cheeley

8.  Bernick, Alex, Fulton County District Attorney's Office

9.  Bever, Thomas Dean, attorney for Shawn Micah Tresher Still

10. Bittman, Robert, attorney for Mark R. Meadows

11. Bondurant Mixson & Elmore LLP

---

[*] For all parties who appeared below, Appellant has included the parties, their attorneys, and their attorneys' law firms. In order to facilitate this Court's review for potential conflicts, Appellant has also included the other named defendants in the state proceeding and their attorneys, where available.

12. Carr, Christopher M., Attorney General of the State of Georgia

13. Cheeley, Robert David, Defendant in *Georgia v. Trump*

14. Chemerinsky, Erwin, *amicus* below

15. Chesebro, Kenneth John, Defendant in *Georgia v. Trump*

16. Childress, Marcus, attorney for *amici*

17. Christenson, David Andrew, *pro se*, denied intervention below

18. Clark, Jeffrey Bossert, Defendant in *Georgia v. Trump*

19. Clement & Murphy, PLLC

20. Clement, Paul D., attorney for Mark R. Meadows

21. Cohen, Darryl B., attorney for Trevian C. Kutti

22. Copeland, Amy, *amicus* below

23. Cromwell, William Grant, attorney for Cathleen Alston Latham

24. Cross, Anna Green, Fulton County District Attorney's Office

25. Cross Kincaid LLC

26. Durham, James D., attorney for Mark R. Meadows in *Georgia v. Trump*

27. Eastman, John Charles, Defendant in *Georgia v. Trump*

28. Ellis, Jenna Lynn, Defendant in *Georgia v. Trump*

29. Englert, Joseph Matthew, attorney for Mark R. Meadows

30. Farmer, John J. Jr., *amicus* below

31. Floyd, Harrison William Prescott, Defendant in *Georgia v. Trump*

32. Floyd, John Earl, Fulton County District Attorney's Office

33.  Francisco, Michael Lee, attorney for Mark R. Meadows

34.  Fried, Charles A., *amicus* below

35.  Frosh, Brian, *amicus*

36.  Fulton County District Attorney's Office

37.  Gerson, Stuart M., *amicus*

38.  Gillen, Craig A., attorney for David James Shafer

39.  Giuliani, Rudolph William Louis, Defendant in *Georgia v. Trump*

40.  Graber, Mark A., *amicus*

41.  Griffin Durham Tanner & Clarkson LLC

42.  Grohovsky, Julie, *amicus* below

43.  Grubman, Scott R., attorney for Kenneth John Chesebro

44.  Hall, Scott Graham, Defendant in *Georgia v. Trump*

45.  Hampton, Misty (a/k/a Emily Misty Hayes), Defendant in *Georgia v. Trump*

46.  Harding, Todd A., attorney for Harrison William Prescott Floyd

47.  Hogue, Franklin James, attorney for Jenna Lynn Ellis

48.  Hogue, Laura Diane, attorney for Jenna Lynn Ellis

49.  Jenner & Block, LLP

50.  Jones, Steve C., U.S. District Court Judge for the Northern District of Georgia

51.  Kallen, Michelle S., attorney for *amici*

52.  Kammer, Brian S., attorney for *amici* below

53. Kelley, Emily E., attorney for Mark R. Meadows

54. Kutti, Trevian C., Defendant in *Georgia v. Trump*

55. Lake, Anthony C., attorney for David James Shafer

56. Latham, Cathleen Alston, Defendant in *Georgia v. Trump*

57. Lee, Stephen Cliffgard, Defendant in *Georgia v. Trump*

58. Little, Jennifer L., attorney for Donald J. Trump

59. Lustbader, Zachary J., attorney for Mark R. Meadows

60. Luttig, J. Michael, *amicus*

61. MacDougald, Harry W., attorney for Jeffrey Bossert Clark

62. Marshall, Mary E., attorney for *amici*

63. McAfee, Scott, Fulton County Superior Court Judge

64. McFerren, William Coleman, attorney for Shawn Micah Tresher Still

65. McGuireWoods, LLP

66. Meyer, Joseph Michael, attorney for *amici* below

67. Miller, Tom, *amicus*

68. Moran, John S., attorney for Mark R. Meadows

69. Morgan, John Thomas III, attorney for *amici*

70. Morris, Bruce H., attorney for Ray Stallings Smith, III

71. Murphy, Erin E., attorney for Mark R. Meadows

72. Ney, Adam, Fulton County District Attorney's Office

73. Novay, Kristen Wright, attorney for Ray Stallings Smith, III

74.  Palmer, Amanda, attorney for Ray Stallings Smith, III

75.  Parker, Wilmer, attorney for John Charles Eastman

76.  Pierson, Holly Anne, attorney for David James Shafer

77.  Powell, Sidney Katherine, Defendant in *Georgia v. Trump*

78.  Rafferty, Brian T., attorney for Sidney Katherine Powell

79.  Ragas, Arnold M., attorney for Harrison William Prescott Floyd

80.  Ratakonda, Maithreyi, attorney for *amici*

81.  Raul, Alan Charles, *amicus*

82.  Rice, Richard A., Jr., attorney for Robert David Cheeley

83.  Roman, Michael A., Defendant in *Georgia v. Trump*

84.  Rood, Grant H., Fulton County District Attorney's Office

85.  Sadow, Steven H., attorney for Donald J. Trump

86.  Saldana, Sarah R., *amicus* below

87.  Samuel, Donald Franklin, attorney for Ray Stallings Smith, III

88.  Shafer, David James, Defendant in *Georgia v. Trump*

89.  Shane, Peter M., *amicus*

90.  Smith, Ray Stallings, III, Defendant in *Georgia v. Trump*

91.  Still, Shawn Micah Tresher, Defendant in *Georgia v. Trump*

92.  Terwilliger, George J., III, attorney for Mark R. Meadows

93.  Trump, Donald J., Defendant in *Georgia v. Trump*

94.  Twardy, Stanley A. Jr., *amicus* below

95.  Volchok, Daniel, attorney for *amici* below

96.  Wade, Nathan J., Fulton County District Attorney's Office

97.  Wade & Campbell Firm

98.  Wakeford, Francis McDonald IV, Fulton County District Attorney's Office

99.  Waxman, Seth P., attorney for *amici* below

100.  Weld, William F., *amicus* below

101.  Wertheimer, Fred, attorney for *amici* below

102.  Williams, Jonathan L., attorney for *amici*

103.  Willis, Fani T., Fulton County District Attorney's Office

104.  Wilmer Cutler Pickering Hale and Dorr LLP

105.  Wooten, John William, Fulton County District Attorney's Office

106.  Wu, Shan, *amicus* below

107.  Young, Daysha D'Anya, Fulton County District Attorney's Office


January 2, 2024

<div style="text-align:right">

s/Paul D. Clement
Paul D. Clement

</div>

## RULE 35-5(C) STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court: *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007); *Jefferson County v. Acker*, 527 U.S. 423 (1999); *Mesa v. California*, 489 U.S. 121 (1989); *Willingham v. Morgan*, 395 U.S. 402 (1969); *Tennessee v. Davis*, 100 U.S. 257 (1879); *Mayor of Nashville v. Cooper*, 73 U.S. (6 Wall.) 247 (1867); *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135 (11th Cir. 2017).

I further express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance:

1. Whether the federal-officer removal statute, 28 U.S.C. §1442(a)(1), categorically excludes former officers.

2. Whether a prosecution of the White House Chief of Staff for alleged conduct done in support of the President of the United States "relat[es] to any act under color of" the Chief of Staff's "office." *Id.*

January 2, 2024

s/Paul D. Clement
Paul D. Clement

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. CIP-1

RULE 35-5(C) STATEMENT ....................................................................... i

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ......................................................................................... 1

STATEMENT OF THE CASE ....................................................................... 3

ARGUMENT ................................................................................................. 6

I.     Denying Removal To Federal Officers Who Have Completed Their Terms Flouts Text, History, Precedent, And The Central Purpose Of §1442(a) ........................................................................................... 6

II.    The Panel Erred—And Created Another Circuit Split—By Effectively Erasing Congress' Amendment Allowing Removal For Cases "Relating To" Acts Under Color Of Office ....................................... 12

CONCLUSION ............................................................................................ 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## Cases

*Arizona v. Manypenny*,
    451 U.S. 232 (1981)...................................................................11

*\*Caver v. Cent. Ala. Elec. Coop.*,
    845 F.3d 1135 (11th Cir. 2017) ...........................................7, 15

*Colorado v. Symes*,
    286 U.S. 510 (1932)...................................................................10

*District of Columbia v. Exxon Mobil Corp.*,
    2023 WL 8721812 (D.C. Cir. Dec. 19, 2023)........................13

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
    353 U.S. 222 (1957)......................................................................9

*Gutierrez v. Ada*,
    528 U.S. 250 (2000)...................................................................10

*In re Commonwealth's Motion*,
    790 F.3d 457 (3d Cir. 2015) .....................................................13

*\*Jefferson County v. Acker*,
    527 U.S. 423 (1999)............................................................ *passim*

*\*Latiolais v. Huntington Ingalls, Inc.*,
    951 F.3d 286 (5th Cir. 2020) (en banc)..............................3, 13

*Lewis v. Clarke*,
    581 U.S. 155 (2017)......................................................................8

*Mayor of Nashville v. Cooper*,
    73 U.S. (6 Wall.) 247 (1867).....................................................15

*\*Mesa v. California*,
    489 U.S. 121 (1989).........................................................6, 7, 11

---

[*] Citations upon which Defendant-Appellant primarily relies are marked with asterisks.

*Nadler v. Mann*,
  951 F.2d 301 (11th Cir. 1992) ................................................................15

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ........................................................................... 1, 8

*Sawyer v. Foster Wheeler LLC*,
  860 F.3d 249 (4th Cir. 2017) ................................................................13

*Tennessee v. Davis*,
  100 U.S. 257 (1879) .............................................................................. 3

*United States v. Pate*,
  84 F.4th 1196 (11th Cir. 2023) ........................................................ 6, 10

\*Watson v. Philip Morris Cos.,
  551 U.S. 142 (2007) ........................................................................ 7, 10

\*Willingham v. Morgan,
  395 U.S. 402 (1969) ................................................................. 3, 10, 12

## Statutes

5 U.S.C. §7323 .......................................................................................14

\*28 U.S.C. §1442 ........................................................................... *passim*

28 U.S.C. §2679 ...................................................................................... 8

Force Act, ch. 57, 4 Stat. 632 (1833) ...................................................... 3

Removal Clarification Act of 2011,
  Pub. L. No. 112-51, 125 Stat. 545 ......................................................13

## Rule

Fed. R. Civ. P. 4 ...................................................................................... 9

## Other Authority

DOJ, *Prosecutors in State Courts* (Dec. 2011),
  https://bjs.ojp.gov/content/pub/pdf/psc07st.pdf .................................12

# INTRODUCTION

The State of Georgia has brought a criminal prosecution against a former White House Chief of Staff for actions that he took predominantly in the West Wing to assist the President. This case belongs in federal court. Indeed, the *raison d'etre* of the federal-officer removal statute is to provide a federal forum to consider federal immunity defenses to such state-court suits. The Supreme Court long ago held that federal immunity defenses protect federal officers even after they leave office. *See, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Nonetheless, a panel of this Court has become the first "in the 190-year history of the federal officer removal statute," Op.17, to hold that the venerable statute provides zero protection for former federal-office holders. That proposition is so novel and expectation-defying that it did not even occur to Georgia to advance it until it was prompted by a supplemental briefing order. The panel's decision is profoundly wrong—it defies text, precedent, and common sense—and profoundly consequential. Indeed, a majority of the panel conceded it could produce "nightmare scenario[s]" and called for Congress to act. Conc.Op.2. Before the cavalry of Congress is called in to fix the statute, the full court should consider whether the error lay instead in the panel's concededly novel holding that the critical procedural protection of federal-officer removal ends long before substantive immunity expires.

The panel's alternative holding that a White House Chief of Staff's actions in the West Wing do not even "relate to" his official duties equally merits en banc review. While the actual adjudication of a federal immunity defense on the merits may require parsing of the Chief of Staff's role and studied consideration of the boundaries of his official duties—precisely the kind of questions that belong in federal court—the jurisdictional inquiry is designedly far more straightforward. The federal removal statute is to be liberally construed, the removing officer's version of events is to be credited, and a single removable issue suffices. Moreover, to further tip the scales in favor of removal, Congress expressly amended the statute in 2011 to allow removal not just of suits "for" official acts, but of actions "relating to" official acts. The panel decision ignores all that and by demanding a close "causal nexus" to official duties opens a circuit split and negates Congress' 2011 amendments.

Nothing in the federal-officer removal statute compels either of the panel's conclusions, let alone both of them. Indeed, the notion that a former White House Chief of Staff is not entitled to a federal forum to defend himself against criminal charges related to his work for the President of the United States is at odds with everything the federal-officer removal statute has long been understood to accomplish. The Court should grant rehearing en banc.

## STATEMENT OF THE CASE

1. The federal-officer removal provision permits removal of an action against "any officer (or person acting under that officer) … for or relating to any act under color of such office." 28 U.S.C. §1442(a)(1). Section 1442(a)(1) is the successor to the 1833 Force Act, which provided sweeping removal protections for "any officer of the United States, *or other person*," ch. 57, 4 Stat. 632 (emphasis added), involved in enforcing federal revenue laws. *See Tennessee v. Davis*, 100 U.S. 257, 268 (1879). "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). To that end, Congress has repeatedly broadened the federal-officer removal statute, most recently expanding it to allow removal not just of actions "for" any act under color of federal office, but also of suits "relating to" such acts. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290-92 (5th Cir. 2020) (en banc) (explaining broadening effect of 2011 amendment). And the Supreme Court "has consistently urged courts to avoid 'a narrow, grudging interpretation of §1442(a).'" *Id.* at 290 (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).

2. Mark Meadows served as the 29th Chief of Staff to the President of the United States from March 31, 2020, to January 20, 2021. He advised the President on issues ranging from the COVID-19 pandemic to military operations. App.391:8-14, 394:2-14. His job duties included redirecting the President's focus from

extraneous matters to critical issues of national and international import. App.404:1-12, 406:11-23.

The Fulton County District Attorney indicted Meadows, along with former President Trump and 17 others, on charges related to alleged interference in the 2020 presidential election. App.15-112. Of the 41 counts, only two implicate Meadows: Count 1, an alleged racketeering conspiracy with the President, and Count 28, an alleged solicitation of violation of oath by a public officer. App.27, 101. The alleged aim of the conspiracy was to "change the outcome of the election in favor of Trump." App.28. And the alleged basis for the solicitation charge is a telephone call Meadows facilitated between President Trump and Georgia Secretary of State Brad Raffensperger in which the President allegedly asked Raffensperger to unlawfully influence the election's outcome. App.87. Only eight of the overt acts listed in the indictment mention Meadows, App.35-36, 38, 58-59, 64, and each took place during his service as Chief of Staff.

Meadows promptly removed the case to federal court under §1442(a)(1). At a subsequent hearing at which he voluntarily testified, Meadows explained that all eight alleged overt acts related to his role as advisor, assistant, and coordinator for the President. *See* App.380-526; Br.8-9 (collecting record citations). All but one of the charged acts took place within the White House. And Meadows testified that the other, his visit to the Cobb County Civic Center, was to gather information for the

4

President.  App.447:14-449:2, 451:9-454:1.  As for the Raffensperger call, Meadows testified that he was on the line to ensure that he would be "able to speak with some kind of direction and authority on allegations that were being made[,] [a]nd if [he] knew that they were not true, it was much easier for [him] to speak with authority with the President."  App.499:8-12.  Raffensperger, who also testified, confirmed that Meadows was on the line "on behalf of the President," App.590:14, and that Meadows made no "inappropriate" comments on the call, App.591:16.

3. The district court remanded the case to state court, acknowledging that some overt acts implicated Meadows' official duties, but maintaining that there was "insufficient evidence to establish that the gravamen, or a heavy majority of overt acts alleged against Meadows relate to his role as White House Chief of Staff." App.761.  A panel of this Court affirmed.  First, after ordering supplemental briefing *sua sponte*, Dkt.7, the panel held that §1442(a)(1) does not cover *former* officers—a proposition that had not occurred to Georgia and that no court had ever previously embraced.  Op.10-21.  Second, the panel held that the prosecution is not "for or relating to" acts done under color of federal office because it perceived an insufficient "causal nexus" between the "gravamen" of Georgia's allegations and any official acts taken by Meadows.  Op.21-35.

## ARGUMENT

I.  **Denying Removal To Federal Officers Who Have Completed Their Terms Flouts Text, History, Precedent, And The Central Purpose Of §1442(a).**

By this Court's own telling, the term "officer" includes "formers" when "statutory context makes clear" that it should. *United States v. Pate*, 84 F.4th 1196, 1210 (11th Cir. 2023) (en banc). Statutory text, precedent, history, and the underlying rationale for federal-officer removal all make clear that in this context former officers may remove actions implicating federal defenses, especially immunity defenses fully applicable to "formers." That likely explains why, "in the 190-year history of the federal officer removal statute, no court has ruled that former officers are excluded from removal." Op.17.

The federal-officer removal statute permits removal of an action against "any officer (or any person acting under that officer) … for or relating to any act under color of such office." 28 U.S.C. §1442(a)(1). The statute applies whenever a case relates to official acts of officers or those who acted on their behalf "at the time of the incidents." *Mesa v. California*, 489 U.S. 121, 123 (1989). The statute does not cease to apply just because the defendant has left federal office by the time he is sued or tries to remove.

That common-sense result flows directly from the statutory text. First and foremost, entitlement to removal under §1442(a)(1) turns on the nature of the conduct that gives rise to the action—the "act under color of such office." That

6

naturally puts the focus on the defendant's status "at the time of the incidents," *id.*, not officer status at later junctures like indictment or removal. As long as the defendant was a current federal officer (or acted under a current federal officer) at the time of the incidents in question, he can remove.

That focus on the disputed incidents and status at that time is particularly evident given that §1442(a)(1) covers not just "any officer," but any "person acting under that officer." Both the Supreme Court and this Court have expressly held that a person "acting under" an officer may remove if, "in carrying out the 'act[s] that are the subject of the petitioners' complaint, [he] *was* 'acting under' any 'agency' or 'officer' of 'the United States." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (quoting 28 U.S.C. §1442(a)(1)) (emphasis added); *accord Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (question is whether defendant "was a person 'acting under' a federal officer when it took the actions complained of in this case"). The rule could hardly be otherwise, as those invoking "acting-under" removal are almost always *temporary* agents of federal officers. Nor would it make sense for a federal contractor with a strong immunity defense to lose a federal forum just because the contract ended or the contracting officer moved on to greener pastures by the time of suit. The panel's decision not only shrinks removal for federal officers, but practically eliminates it for those acting under them.

7

It is also telling that the statute expressly includes suits in an "individual capacity," 28 U.S.C. §1442(a)(1), which, unlike official-capacity suits, continue against former officers, without "successors automatically assum[ing]" retiring officers' "role in the litigation." *Lewis v. Clarke*, 581 U.S. 155, 162 (2017). That express coverage for individual-capacity suits underscores that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Acker*, 527 U.S. at 431. It is, of course, black-letter law that immunity defenses in individual-capacity suits turn on the nature of the challenged action, not status at the time of suit, and fully protect former officers. *See Nixon*, 457 U.S. at 756. Thus, both common sense and the textual coverage of individual-capacity suits strongly support coverage for former officers.

Moreover, the language in §1442(a)(1) is similar to the language in the closely related Westfall Act, which makes exclusive the remedy against the United States for damages "resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. §2679(b)(1). That act goes on to preclude actions "against the employee" or "against *the estate of such employee*," *id.* (emphasis added), thus

8

confirming that Congress routinely uses terms like "officer" or employee" in the immunity context to protect current and former employees alike.[1]

The panel resisted all these textual and contextual indications in favor of becoming the first court in 190 years to deny a federal forum to federal officers sued after they left office.  None of its reasons for that unprecedented conclusion holds water.  The panel first emphasized the variation between §1442(a)(1) and §1442(b), which allows removal of an action "by an alien against any citizen of a State who is, or at the time the alleged action accrued was, a civil officer of the United States and is a nonresident of such state."  28 U.S.C. §1442(b).  The panel posited that because subsection (b) expressly refers to the defendant's status "at the time the alleged action accrued," the exclusion of comparable language from subsection (a)(1) must reflect an intentional effort to exclude former officers.  Op.11-12.

At the outset, seeking to draw inferences from comparing subsections (a)(1) and (b) is a dubious enterprise, for although they are now codified together, the two provisions were enacted entirely separately and 40 years apart.  *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227-28 (1957) (subsequent section rearrangement through 1948 codification of Title 28 has no substantive effect

---

[1] *See also, e.g.*, Fed. R. Civ. P. 4(i) (individual-capacity suits against "a United States officer or employee … for an act or omission occurring in connection with duties performed on the United States' behalf"); *id.* 2000 Amend. Comm. Note (language applies "in the same way" to suits "against a former officer or employee").

"unless … clearly expressed"); *cf. Gutierrez v. Ada*, 528 U.S. 250, 257-58 (2000) ("drafting difference … four years after enacting the phrase at issue" is "beside the point in reading the first enactment"). Moreover, one could just as easily draw the opposite inference from the fact that subsection (b) uses the present tense "is," while subsection (a)(1) does not. In reality, subsection (b) uses both "is" and "the time the alleged action accrued" because it is an entirely status-based provision that applies without regard to the subject matter of the state-court suit. Subsection (a)(1), by contrast, contains neither phrase because it is a conduct-based provision, granting a federal forum only for suits related to actions taken under color of federal office.

Finally, the panel drew heavily on this Court's recent en banc decision in *Pate*. But *Pate* itself emphasized that whether "officer" includes "formers" depends on "context." 84 F.4th at 1200. And the relevant contexts of the two statutes could not be more different. *Pate* involved a criminal statute demanding fair notice and requiring a narrow construction under the rule of lenity. This case involves a removal statute that the Supreme Court has repeatedly said must be "liberally construed," *Watson*, 551 U.S. at 147, rather than given "a narrow, grudging interpretation," *Willingham*, 395 U.S. at 407. *See also, e.g.*, *Colorado v. Symes*, 286 U.S. 510, 517 (1932) ("It scarcely need be said that" the act is "to be liberally construed[.]"). Moreover, even *Pate* focused not on officer status at the time of indictment, but on status at the time of the *actus reus*. That is both the natural focus

10

of a criminal statute and the functional equivalent of considering officer status "at the time of the incidents," *Mesa*, 489 U.S. at 123, not at the time of indictment or removal, in applying §1442(a).

The panel not only ignored the Supreme Court's liberal-construction command, but put a thumb on the scale *against* removal, reasoning that federal courts must hesitate to interfere with "a State's right to make and enforce its own criminal laws." Op.19. But removal does not prevent a state from enforcing its criminal laws, any more than removal of diversity cases precludes application of a state's civil law. Section 1442(a)(1) "is a pure jurisdictional statute," *Mesa*, 489 U.S. at 136; it merely provides an "impartial setting … in which the federal defense of immunity can be considered." *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). Moreover, any effort to interpret §1442(a) more grudgingly in criminal cases defies not only the Supreme Court's liberal-construction teaching, which has come predominantly in criminal cases, but statutory text, as §1442(a) applies equally to a "civil action or criminal prosecution."

The panel conceded that its decision not only is unprecedented, but conflicts with countless cases "in other circuits" in which "former officers have removed actions." Op.17-18 (collecting cases). And as two of its members acknowledged, the decision portends "nightmare scenario[s]," necessitating congressional intervention if the decision stands. Conc.Op.2. Inevitably, at least some of the

Nation's 2,330 chief local prosecutors,[2] distributed across jurisdictions red and blue, will view the panel's opinion as a green light to make a name for themselves by filing "day-after" indictments following the next change in administration.  And the open season will not be limited to executive officials:  The statute uses identical language when referring to "officer[s] of either House of Congress" and "officer[s] of the courts of the United States."  28 U.S.C. §1442(a)(3)-(4).  Thus, under the panel decision, any disgruntled constituent or litigant could sue any outgoing congressperson or federal judge.  Hopefully state courts would make short work of most such efforts, but the whole point of the federal-officer removal statute is to protect defendants from being forced to rely on potentially "hostile state courts" when litigating their federal immunity defenses.  *Willingham*, 395 U.S. at 405.

## II.  The Panel Erred—And Created Another Circuit Split—By Effectively Erasing Congress' Amendment Allowing Removal For Cases "Relating To" Acts Under Color Of Office.

The panel also faulted Meadows for purportedly failing to prove a "causal connection between the charged conduct and asserted official authority."  Op.21 (quoting *Acker*, 527 U.S. at 431).  But it neglected to mention that since *Acker* (and other cases the panel invoked) Congress broadened the federal-officer removal statute via 2011 amendments that make a "causal nexus" test both atextual and

---

[2]  *See* DOJ, *Prosecutors in State Courts* (Dec. 2011), https://bjs.ojp.gov/content/pub/pdf/psc07st.pdf.

outmoded, as four other circuits have recognized.  By ignoring that revision and those decisions, the panel not only stumbled into another circuit split, but set the removal bar so high as to require an exegesis on the Chief of Staff's role that is wholly out of place in a jurisdictional inquiry.

Before 2011, the removal statute applied only if a suit was "for any act under color of office," a phrase the Supreme Court interpreted to require the officer to "show a nexus, a causal connection between the charged conduct and asserted official authority."  *Acker*, 527 U.S. at 431(quotation marks omitted).  But in 2011, Congress amended the statute to permit removal of an action "for *or relating to* any act under color of such office," 28 U.S.C. §1442(a)(1) (emphasis added).  *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, §2(b)(1)(A), 125 Stat. 545, 545.  As the en banc Fifth Circuit held, by doing so, "Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected or associated*, with acts under color of federal office."  *Latiolais*, 951 F.3d at 292. The Third and Fourth Circuits likewise have held that the 2011 amendment abrogated the causal-nexus test, as did the D.C. Circuit just one day after the panel opinion issued.  *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017); *In re Commonwealth's Motion*, 790 F.3d 457, 471 (3d Cir. 2015); *District of Columbia v. Exxon Mobil Corp.*, 2023 WL 8721812, at *7 (D.C. Cir. Dec. 19, 2023).

Rather than address the 2011 amendment or any of the decisions interpreting it, the panel blithely applied the very nexus test Congress eliminated. In fact, the panel raised the bar even higher than it was *before* the amendment, essentially requiring Meadows to prove that his federal immunity defense will *succeed* on the merits just to establish jurisdiction to litigate it in federal court. In radically raising the bar for removal, the panel erred in three related but distinct ways.

*First*, by rendering the availability of removal dependent on the contours of the Chief of Staff's official authority, the panel put the cart before the horse. While the scope of a federal officer's authority is certainly relevant to the merits of an immunity defense, such an elaborate inquiry is misplaced at the jurisdictional threshold. Instead, in removing, an officer need only prove that the conduct at issue was "relat[ed] to" his official duties, 28 U.S.C. §1442(a)(1), and gives rise to a "colorable" federal defense, *Acker*, 527 U.S. at 431. Those requirements set a deliberately low bar that reserves novel and sensitive questions about the role of the Chief of Staff and the impact of the Hatch Act (assuming it can even constitutionally apply to the Chief of Staff) for federal courts with the benefit of full merits briefing.[3]

---

[3] The panel went particularly far afield in relying on the Hatch Act to determine whether the acts at issue were done under color of office. A federal employee can violate that act only by "us[ing] official authority" to engage in political activity. 5 U.S.C. §7323(a)(1). Thus, while a possible Hatch Act violation might have some relevance to the merits, bandying about Hatch Act transgressions at the jurisdictional stage only underscores that misuse of *official* authority is being alleged. Moreover, the very idea that state courts might be addressing novel issues about the scope of

14

*Second*, by focusing on the acts charged in the indictment, the panel ignored that in assessing removal the court must "credit the [officer's] theory of the case." *Acker*, 527 U.S. at 432. Thus, the focus should not be on what is charged in the indictment—which will almost always allege *ultra vires* action—but on the defendant's version of events that give rise to a colorable federal defense. To demand anything more would contravene the well-settled rule that a federal "defense need only be plausible; its ultimate validity is not to be determined at the time of removal." *Caver*, 845 F.3d at 1145; *see also Mayor of Nashville v. Cooper*, 73 U.S. (6 Wall.) 247, 254 (1867) ("The validity of the defence … involves wholly different inquiries … [with] no connection whatever with the question of jurisdiction.").

*Third*, the panel compounded its error by looking at the "gravamen" of what the state alleges, rather than whether Meadows' asserted defense to any claim permits removal. Op.23. It is black-letter law both that a court must "credit the [officer's] theory of the case for purposes of" assessing removability, *Acker*, 527 U.S. at 432, and that the entire action is removable so long as the federal officer presents *any* colorable federal defense to *any* claim, *Nadler v. Mann*, 951 F.2d 301, 306 n.9 (11th Cir. 1992). Yet the panel bypassed all that black-letter law by making a judgment about what it perceived to be the "heart of the indictment." Op.23.

---

the Hatch Act and its applicability to the Chief of Staff underscores the need for a federal forum.

15

*    *    *

This compendium of errors was necessary to defeat removal in what should have been the most obvious case imaginable for federal-officer removal.  While courts struggle with whether tobacco companies and health insurers can remove, a White House Chief of Staff facing a local prosecutor's indictment based on actions taken in the West Wing should not be a close call.  No Chief of Staff has ever had to defend his West Wing actions in state court.  Even Haldeman and Ehrlichman got a federal forum.  But if the panel decision stands, and Meadows becomes the first, he will not be last.  Even a majority of the panel recognized the dangerous precedent they were setting and called for congressional intervention.  But before asking Congress to redress an unprecedented and dangerous statutory holding, it is far better to exhaust the judicial alternatives to restoring uniformity and rationality to the law. This Court should grant rehearing en banc.

16

# CONCLUSION

For the foregoing reasons, this Court should grant the petition.

Respectfully submitted,

GEORGE J. TERWILLIGER, III
TERWILLIGER LAW PLLC
PO Box 74
Delaplane, VA 20144

JOHN S. MORAN
MCGUIRE WOODS LLP
888 16th Street N.W., Suite 500
Washington, D.C. 20006

s/Paul D. Clement
PAUL D. CLEMENT
ERIN E. MURPHY
ZACHARY J. LUSTBADER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Defendant-Appellant*

January 2, 2024

17

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the word limit of Fed. R. App. P. 35(b)(2)(A) because it contains 3,877 words, excluding the parts of the brief exempted by 11th Cir. R. 35-1.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

January 2, 2024

<div style="margin-left:auto">

s/Paul D. Clement
Paul D. Clement

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

# ATTACHMENT

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12958

_____

THE STATE OF GEORGIA,

                                        Plaintiff-Appellee,

*versus*

MARK RANDALL MEADOWS,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:23-cv-03621-SCJ

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and ABUDU, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether Mark Meadows, former chief of staff at the White House, may remove his state criminal prosecution to federal court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). After a Fulton County grand jury indicted Meadows for conspiring to interfere in the 2020 presidential election, Meadows filed a notice to remove the action to the Northern District of Georgia. The district court held an evidentiary hearing and then remanded because Meadows's charged conduct was not performed under color of his federal office. Because federal-officer removal under section 1442(a)(1) does not apply to *former* federal officers, and even if it did, the events giving rise to this criminal action were not related to Meadows's official duties, we affirm.

## I. BACKGROUND

Mark Meadows served as chief of staff at the White House and assistant to former President Donald Trump when the November 2020 presidential election occurred. Trump lost his bid for reelection by a margin of 306 to 232 in the Electoral College. In 2023, a Fulton County grand jury indicted Meadows, Trump, and 17 other defendants with crimes related to election interference in Georgia. The indictment charged Meadows with two state law crimes: conspiracy in violation of the Georgia Racketeer Influenced and Corrupt Organizations Act, *see* GA. CODE ANN. § 16-14-4(b), (c),

and soliciting the violation of oath by a public officer, *see id.* §§ 16-4-7, 16-10-1.

The indictment alleged that Meadows joined and committed eight overt acts in furtherance of an illegal conspiracy to "change the outcome of the election in favor of Trump." These eight acts were as follows:

> *Act 5*: Attending a meeting with Michigan state legislators in which Trump "made false statements concerning [election] fraud."

> *Act 6*: Sending a text message to United States Representative Scott Perry of Pennsylvania that asked, "Can you send me the number for the speaker and the leader of PA Legislature. POTUS wants to chat with them."

> *Act 9*: Meeting with Pennsylvania state legislators to discuss holding a special session of the Pennsylvania General Assembly.

> *Act 19*: Requesting that Trump political aide John McEntee prepare a memorandum "outlining a strategy for disrupting and delaying the joint session of Congress on January 6" by having former Vice President Mike Pence "count only half of the electoral votes from certain states."

> *Act 92*: Traveling to Cobb County, Georgia, to attempt to observe a nonpublic signature match audit, at which point state election officials had to "prevent[]

[Meadows] from entering into the space where the audit was being conducted."

*Act 93*: Arranging a telephone call between Trump and Georgia Secretary of State Chief Investigator Frances Watson, in which Trump "falsely stated" that he had won the presidential election "by hundreds of thousands of votes" and told Watson that "when the right answer comes out you'll be praised."

*Act 96*: Sending a text message to an employee of the Office of the Georgia Secretary of State that asked, "Is there a way to speed up Fulton county signature verification in order to have results before Jan 6 if the trump campaign assist financially."

*Act 112*: Soliciting Georgia Secretary of State Brad Raffensperger to violate his oath of public office by "unlawfully altering" "the certified returns for presidential electors," in violation of Georgia Code sections 16-4-7 and 16-10-1.

Meadows filed a notice of removal in the district court, *see* 28 U.S.C. § 1455, based on federal-officer jurisdiction, *see id.* § 1442(a)(1). Meadows argued that the overt acts charged in the indictment related to his official responsibilities as chief of staff and that he had colorable federal defenses. The district court denied summary remand and ordered an evidentiary hearing. *See id.* § 1455(b)(5).

At the hearing, Meadows testified about his role as chief of staff. He explained that his job was a "24/7" responsibility and that

his function "was to oversee all the federal operations" and to "be aware of everything that was going on." He stated that his responsibilities included meeting with cabinet officials, members of Congress, business leaders, and state officials, including governors. Meadows was invited to "almost every meeting" involving the President, as either a principal or an observer. He advised the President on a range of federal issues, from national security to the agricultural supply chain to prescription drug policy. He also gave political advice and explained that "everything that [the President] do[es] from a policy standpoint has a political implication." Declarations from White House staffers corroborated that Meadows was "on duty" at all hours even when away from the White House and that he was responsible for "managing the President's calendar" and "arranging meetings, calls, and other discussions with federal, state, and local officials."

Meadows testified that he understood that, as chief of staff, he was bound by the Hatch Act. *See* 5 U.S.C. § 7323(a)(1) (providing that a government employee may not "use his official authority or influence for the purpose of interfering with or affecting the result of an election"). Meadows understood the Act to prevent him from "advocat[ing] for a particular candidate" in his official capacity and from "campaign[ing] actively . . . in [his] official title."

Finally, Meadows testified about his responsibilities as specifically related to the overt acts charged in the indictment:

*Act 5 (Michigan legislators meeting)*: Meadows testified that he was present and that "most of that [meeting]

had to do with allegations of potential fraud in Michigan." He stated that his presence was relevant to his responsibility to broadly "give advice to the President" and to "be aware of what is consuming the President's time."

*Act 6 (Scott Perry text)*: Meadows acknowledged sending a text message asking for the phone number of the Pennsylvania House Speaker and testified that he "regularly" retrieved the phone numbers of state officials for the President.

*Act 9 (Pennsylvania legislators meeting)*: Meadows testified that "to the best of [his] recollection," he was not at the portion of the meeting discussing the election.

*Act 19 (McEntee memorandum)*: Meadows testified that he did not ask McEntee for any memorandum on a strategy to disrupt Congress.

*Act 92 (Cobb County visit)*: Meadows testified that his observation of the nonpublic signature match audit in Cobb County was relevant to the "transfer of power" to the Biden administration, because the "open question . . . in the President's mind" about Georgia voter fraud posed a roadblock to the transition plan. According to Meadows, the visit "relate[d] completely" to his official responsibilities because he needed to "look at the [signature audit] process that they were going through" to ensure "everything [was] being done right" to smooth the transition. Meadows also testified that he went to Cobb County under his

own discretion and that "[n]o one directed [him] to go."

*Act 93 (Watson call)*: Meadows admitted to arranging a call between Watson and Trump. He testified that the call was related to his chief of staff duties because "the President was interested in all of the election outcomes [being] . . . accurate as they affected him."

*Act 96 (financial assistance text)*: Meadows admitted to sending a text message asking whether it was possible to speed up Fulton County's signature verification if the Trump campaign "assist[ed] financially." But he denied that the message was a "financial offer" and asserted that he "wasn't speaking on behalf of the [Trump] campaign." Instead, Meadows explained that he had recently learned that a Wisconsin vote recount was possible if the Trump campaign paid for it, so he wanted to understand if a Georgia recount was also impeded by "financial constraints." Meadows testified that he wanted to understand whether the impediment was "a financial resource issue . . . [or] manpower issue."

*Act 112 (Secretary Raffensperger solicitation)*: Meadows admitted to being on the call with Trump, Secretary Raffensperger, and several attorneys who represented either Trump personally or the Trump campaign. Meadows testified that the purpose of the call was to obtain "signature verification in Fulton County" and that the President wanted to find "a less litigious way" of doing so. Meadows asserted that verification was

the President's goal in his official capacity, but he ap-
parently "d[id] not know" whether verification was
also a goal of the Trump campaign.

Georgia presented rebuttal evidence, including evidence
that Meadows was acting on behalf of the Trump campaign during
the call with Secretary Raffensperger. Secretary Raffensperger tes-
tified that he understood Meadows to be asking for a resolution to
*Trump v. Kemp*, 511 F. Supp. 3d 1325 (N.D. Ga. 2021), and other
Georgia election-challenge lawsuits. He stated, "Those were
Trump campaign lawyers [on the call], so I felt that it was a cam-
paign call." Georgia also submitted a recording of the call, in which
Meadows requested to sidestep the legal roadblocks to a Georgia
vote recount:

> [T]here are allegations where we believe that not
> every vote or fair vote and legal vote was . . .
> counted . . . . What I'm hopeful for is there some way
> that we can find some kind of agreement to look at
> this a little bit more fully. You know the president
> mentioned Fulton County. . . . [S]o Mr. Secretary, I
> was hopeful that, you know, in the spirit of coopera-
> tion and compromise is there something that we can
> at least have a discussion to look at some of these al-
> legations to find a path forward that's less litigious?

The district court remanded. It explained that sec-
tion 1442(a)(1) requires Meadows to prove that he is a federal of-
ficer, that his charged conduct was performed under color of fed-
eral office, and that he has a "colorable" federal defense. *See Caver*

*v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017). The district court found that Georgia had conceded that Meadows was an "officer" because he had served as chief of staff "at the time of the events alleged." But it found that Meadows had failed to prove any causal connection between his charged conduct and his office, because the "gravamen" of Georgia's case and the "heavy majority" of the overt acts were not connected with the performance of Meadows's official duties. The district court did not address whether Meadows had a colorable federal defense.

After Meadows filed this appeal, *see* 28 U.S.C. § 1447(d), we ordered supplemental briefing on whether section 1442(a)(1) applies to former federal officers, in the light of our decision in *United States v. Pate*, 84 F.4th 1196 (11th Cir. 2023) (en banc). Georgia argued that section 1442(a)(1) applies only to current officers, and Meadows argued that the statute covers former officers.

## II. STANDARD OF REVIEW

We review *de novo* issues of removal jurisdiction. *See Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 780–81 (11th Cir. 2005).

## III. DISCUSSION

The federal-officer removal statute protects an officer of the United States from having to answer for his official conduct in a state court. *See* 28 U.S.C. § 1442(a)(1). Section 1442(a)(1) provides a right of removal to federal court if a defendant proves that he is a federal officer, his conduct underlying the suit was performed under color of federal office, and he has a "colorable" federal defense. *Caver*, 845 F.3d at 1142; *see also Jefferson County v. Acker*, 527 U.S. 423,

431 (1999). The defendant bears the burden of proof, *Leonard v. Enter. Rent a Car*, 279 F.3d 967, 972 (11th Cir. 2002), but that bar is "quite low," *Caver*, 845 F.3d at 1144 (citation and internal quotation marks omitted).

We divide our discussion in two parts. First, we explain that section 1442(a)(1) does not apply to *former* officers—so Meadows, as a former chief of staff, is not a federal "officer" within the meaning of the removal statute. Second, we explain that even if Meadows were an "officer," his participation in an alleged conspiracy to overturn a presidential election was not related to his official duties.

A. *Section 1442(a)(1) Does Not Apply to Former Federal Officers.*

Section 1442(a)(1) provides that "any officer . . . of the United States" may remove to federal court a criminal prosecution "for or relating to any act under color of such office." We have long understood the statute to afford a *current* federal officer a federal forum for the adjudication of his liability or guilt. *See Florida v. Cohen*, 887 F.2d 1451, 1453 (11th Cir. 1989) (first citing *Willingham v. Morgan*, 395 U.S. 402, 405 (1969); and then citing *Loftin v. Rush*, 767 F.2d 800, 804 (11th Cir. 1985)). But the statute does not apply to *former* federal officers.

Our interpretation of a statute must begin "with the language of the statute itself." *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989). The text of section 1442(a)(1) applies to only current officers. It is silent on the removal of a prosecution commenced against a *former* officer of the United States. The ordinary meaning of "officer" does not include "former officer." *See Pate*, 84

F.4th at 1201–02 (determining the meaning of "officer" using dictionary definitions, common understanding, and the Dictionary Act, 1 U.S.C. § 1). And the ordinary meaning usually controls. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) ("When called on to resolve a dispute over a statute's meaning, [a] [c]ourt normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them.").

The whole text of section 1442 reinforces the ordinary meaning of subsection (a)(1). Indeed, in contrast to the silence in subsection (a)(1), subsection (b) expressly provides for the removal of actions commenced against a former officer. Section 1442(b) grants a right of removal to a person "who is, or at *the time the alleged action accrued was*, a civil officer of the United States." 28 U.S.C. § 1442(b) (emphasis added). This variation in language connotes a difference in meaning: when Congress includes "particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)); *accord Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 25, at 170 (2012) ("[A] material variation in terms suggests a variation in meaning.").

The presumption that Congress intentionally omitted any reference to former officers applies "with particular force" to this statute. *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015). The provisions containing disparate language are "in close proximity" to each other, *id.*, and address the same subject matter, *see DIRECTV, Inc. v. Brown*, 371 F.3d 814, 817 (11th Cir. 2004); *see also* Scalia & Garner, *Reading Law* § 39, at 252 ("Statutes *in pari materia* are to be interpreted together, as though they were one law."). "[W]hen Congress uses different language in *similar sections*, it intends different meanings." *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 859 (11th Cir. 2000) (emphasis added) (citing *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). The explicit reference to former officers, in an adjacent section that also addresses removal jurisdiction, suggests that section 1442(a)(1) does not apply to former officers.

To be sure, the term "officer" may sometimes include former officers. But that interpretation must be supported by "compelling textual evidence," and the "statutory context [must] make[] clear" that Congress intended the broader meaning. *Pate*, 84 F.4th at 1208–10.

In *Pate*, we discussed two instances where textual indicia supported an interpretation of the term "employee" or "officer" as including formers. *Id.* First, in *Robinson v. Shell Oil Co.*, the Supreme Court held that "employee" as used in section 704(a) of Title VII of the Civil Rights Act of 1964 included former employees because section 704(a) provided "reinstatement" as a remedy, which could

be awarded only to former employees. 519 U.S. 337, 342–43 (1997). Second, in *Davis v. Michigan Department of Treasury*, the Supreme Court held that a statutory reference to "compensation," 4 U.S.C. § 111(a), which necessarily included retirement benefits, implied coverage of retired employees. 489 U.S. 803, 808–09 (1989).

But in *Pate*, we held that another statute, 18 U.S.C. § 1114, lacked any textual indicia to support a "strained" interpretation including former officers. 84 F.4th at 1210. The same is true here: no indicia from text or structure suggest that section 1442(a)(1) covers former officers.

Meadows argues that the discrepancy between subsections (a) and (b) can be explained by the provisions' different "focuses." Section 1442(a)(1) focuses on "conduct" and requires an act relating to the defendant's federal office, argues Meadows, but section 1442(b) requires no such act and removal instead turns on the defendant's "status" as an officer when the action accrues. Meadows contends that the explicit reference to former officers in subsection (b) reflects the different showings required from a current and from a former officer—the first must prove that he *is* an officer, while the second must prove that he was an officer *when the action accrued*. Meadows argues that section 1442(a)(1), in contrast, demands only proof that a person held federal office *at the time of the official act* alleged in the suit.

We rejected a similar interpretive approach applied to a similar statute in *Pate*. In *Pate*, we explained that the secondary condition in the statute—requiring an officer to be targeted "on account

of the performance of official duties"—could not alter the primary condition—that the officer be a current federal employee. *Id.* at 1204 (internal quotation marks omitted) (quoting 18 U.S.C. § 1114). So too here.

The syntax of section 1442(a) does not suggest that removal depends on the *singular* condition that the defendant held office at the time of his charged conduct. Instead, the statute prescribes *multiple* independent conditions for removal: first, the defendant must be "any officer . . . of the United States," and second, the suit he seeks to remove must be "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1); *cf. Pate*, 84 F.4th at 1203–05 (statutory provision, covering "any officer or employee of the United States . . . while such officer or employee is engaged in or on account of the performance of official duties," imposed two independent conditions). Although the secondary condition of section 1442(a)(1)—that the officer's act relate to his federal office—limits the class of officers eligible for removal, that condition does not "expand the scope" of the first condition "beyond its ordinary meaning." *Id.* The requirement that a defendant be a current "officer . . . of the United States" stands as an independent prerequisite for removal. *See* 28 U.S.C. § 1442(a)(1).

Meadows also contends that subsections 1442(a)(1) and (b) cannot be read in conjunction because they were drafted separately and not combined until 1948 as part of a broader codification. *See* 62 Stat. 869, 938 (June 25, 1948). The predecessor to section 1442(a)(1) was enacted in 1833, *see* 4 Stat. 632, 633 § 3 (Mar. 2,

1833), decades before the predecessor to section 1442(b), *see* 17 Stat. 44 (Mar. 30, 1872); *see also Watson v. Philip Morris Cos.*, 551 U.S. 142, 148–49 (2007) (recounting statutory history). We disagree.

The disparate origins of these subsections do not rebut the presumption that the variance in their language is meaningful. We have explained that "dissimilar language need not always have been enacted at the same time or found in the same statute" to warrant the presumption that dissimilarities are meaningful when the statutes "exist within the same field of legislation." *Pate*, 84 F.4th at 1202 (internal quotation marks omitted) (citing *United States v. Papagno*, 639 F.3d 1093, 1099 n.3 (D.C. Cir. 2011) (Kavanaugh, J.) (cataloging examples)). Moreover, the statutory history reveals that Congress *in fact* contemplated the relationship between the two removal provisions. Congress expressly cross-referenced the predecessor to subsection (a) in the enacted text of the predecessor to subsubsection (b). *See* 17 Stat. 44 (Mar. 30, 1872) (predecessor to subsection (b), providing that removal shall occur "in the same manner as now provided for . . . by the provisions of section three of the act of March second, eighteen hundred and thirty-three [predecessor to subsection (a)]"). This cross-reference reinforces the presumption that the variance in language between the two provisions reflects a deliberate choice. *MacLean*, 574 U.S. at 391; *Delgado v. U.S. Att'y Gen.*, 487 F.3d 855, 862 (11th Cir. 2007) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling." (citation and internal quotation marks omitted)).

Congress has had ample opportunity to modify the discrepancy between subsections (a) and (b), but it has not done so. The two provisions have been codified in adjacent subsections of the United States Code since 1948. Congress did not modify the relevant variance during codification or during revisions in 1996, 2011, or 2013. *See* Pub. L. No. 104-317, § 206, 110 Stat. 3847, 3850 (Oct. 19, 1996); Pub. L. No. 112-51, § 2, 125 Stat. 545, 545–46 (Nov. 9, 2011); Pub. L. No. 112-239, § 1086, 126 Stat. 1632, 1969–70 (Jan. 2, 2013). Our precedents establish that the decision to preserve grandfathered language, despite a "clear ability" to modify it, is significant. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1226 (11th Cir. 2001) (citation and internal quotation marks omitted).

Earlier versions of section 1442(a)(1) also evidence that when Congress intended to permit removal by former officers, it expressed that intent with clear language. The 1911 codification of the removal provision used nearly identical language and was also silent as to former officers. *See* 36 Stat. 1087, 1097, § 33 (Mar. 3, 1911) (providing for removal of any suit "commenced in any court of a State *against any officer* . . . on account of any act done under color his office." (emphasis added)). But the same section of the 1911 statute permitted removal by former officers of another class: Congress used temporal language to allow the removal of "any suit . . . commenced against any person for [or] on account of anything done by him *while an officer of either House of Congress* in the discharge of his official duty." *Id.* (emphasis added). The temporal language in the congressional-officer provision supports the view that

the contrasting silence in the federal-officer provision, within the same section of the same statute, controls its interpretation.

Meadows identifies no precedent from either the Supreme Court or this Court permitting removal under section 1442(a)(1) by a former officer. True, in *Mesa v. California*, the Supreme Court used past-tense language to explain that the defendants "were federal employees at the time of the incidents," 489 U.S. 121, 123 (1989), but the underlying circuit decision made clear that the defendants *remained* employees during the state prosecution, *see California v. Mesa*, 813 F.2d 960, 961 (9th Cir. 1987) ("[Defendants] *are* United States mail carriers charged with violations of state law." (emphasis added)); *see also* Petition for Writ of Certiorari, *Mesa*, 489 U.S. 121 (No. 87-1206), 1988 WL 1094058, at *2 ("[Defendants] *are* employees of the United States Postal Service." (emphasis added)). Likewise, in *Maryland v. Soper*, the defendants "averred that they were Federal prohibition agents" at the time of removal. 270 U.S. 9, 22 (1926) (adjudicating removal under the predecessor statute to section 1442(a)). Nor can Meadows identify a precedent from our Circuit clearly involving a former officer. *See Cohen*, 887 F.2d at 1454 (apparently current deputy marshal and federal agents sought removal); *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) (unclear whether a federal manufacturing inspection representative was still employed when he sought removal).

We acknowledge that, in the 190-year history of the federal-officer removal statute, no court has ruled that former officers are excluded from removal. And we acknowledge that former officers

have removed actions in other circuits. But in most of these deci-sions—many of which were summary removals and some of which were nonprecedential—the courts did not discuss the text of sec-tion 1442 at all. *See, e.g.*, *Eagar v. Drake*, 829 F. App'x 878, 881 (10th Cir. 2020); *Arizona v. Elmer*, 21 F.3d 331, 334 (9th Cir. 1994); *Meros v. Dimon*, No. 2:18-cv-510, 2019 WL 1384390, at *1 (S.D. Ohio Mar. 27, 2019). And in others, the courts did not address the former-of-ficer question. *See, e.g.*, *Guancione v. Guevara*, No. 23-cv-01924-JSW, 2023 WL 3819368, at *1 (N.D. Cal. June 5, 2023); *Brunson v. Adams*, No. 1:21-CV-00111-JNP-JCB, 2021 WL 5403892, at *3 (D. Utah Oct. 19, 2021). So the decisions permitting former officers to remove have tended to involve cursory jurisdictional rulings, which we do not credit. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings of this sort . . . have no precedential effect.").

Indeed, we are aware of only one court that has squarely ad-dressed the former-officer question, in dictum, and it fails to per-suade us. *See New York v. Trump*, No. 23 Civ. 3773 (AKH), 2023 WL 4614689, at *5 (S.D.N.Y. July 19, 2023) (stating that former officers may remove under section 1442(a)(1)). Without considering the ordinary meaning of the statutory text, that district court reasoned that section 1442(a)(1) should apply to former officers because it "would make little sense if this were not the rule, for the very *pur-pose* of the Removal Statute is to allow federal courts to adjudicate challenges to acts done under color of federal authority." *Id.* (em-phasis added). But the "best evidence of that purpose is the statu-tory text adopted by both Houses of Congress and submitted to the

President." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991); Scalia & Garner, *Reading Law* § 2, at 56 ("[T]he purpose must be derived from the text."). Purpose "must be defined precisely, and not in a fashion that smuggles in the answer to the question before the decision-maker." Scalia & Garner, *Reading Law* § 2, at 56.

The Supreme Court has explained that the purpose of federal-officer removal is to protect the federal government from the "interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court . . . officers . . . of the Federal Government acting within the scope of their authority." *Watson*, 551 U.S. at 150 (alterations adopted) (internal quotation marks omitted) (quoting *Willingham*, 395 U.S. at 406)). Because the federal government "can act only through its officers and agents," if states could unconditionally try federal officers, "the operations of the general government may at any time be arrested at the will of one of [the states]." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Shielding officers performing current duties effects the statute's purpose of protecting the operations of federal government. But limiting protections to current officers also respects the balance between state and federal interests, by enforcing a "'policy against federal interference with state criminal proceedings.'" *Mesa*, 489 U.S. at 138 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981)).

The Supreme Court has instructed that federal courts must "retain[] the highest regard for a State's right to make and enforce its own criminal laws." *Manypenny*, 451 U.S. at 243. The jurisdiction

to try state offenses should not "be wrested from [state] courts" lightly. *Colorado v. Symes*, 286 U.S. 510, 518 (1932). Interpreting section 1442(a)(1) as limited to its ordinary meaning counters "true state hostility" against the enforcement of unpopular national laws and limits federal jurisdiction to cases in which the hostility is actually "directed against federal officers' efforts to carry out their federally mandated duties." *Mesa*, 489 U.S. at 139; *see also Soper*, 270 U.S. at 32 ("The constitutional validity of [federal-officer removal] rests on the right and power of the United States to secure the efficient execution of its laws and to prevent interference . . . by state prosecutions instituted against federal officers in enforcing such laws."). In contrast, a state prosecution of a *former* officer does not interfere with ongoing federal functions—case-in-point, no one suggests that Georgia's prosecution of Meadows has hindered the current administration.

Meadows argues that section 1442(a) is intended to provide a federal forum that is coextensive with federal immunity defenses, which may be available to former officers. *See Willingham*, 395 U.S. at 407 ("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court."); *cf. Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (absolute immunity is available to former presidents). Meadows asserts that section 1442(a) is "meant to avoid" all state adjudications of federal immunities. We disagree.

Meadows cites no authority suggesting that state courts are unequipped to evaluate federal immunities. State courts have long

adjudicated, for example, whether federal officers are entitled to Supremacy Clause immunity under *In re Neagle*, 135 U.S. 1 (1890). *See, e.g.*, *People v. Denman*, 177 P. 461, 465 (Cal. 1918); *State v. Adler*, 55 S.W. 851, 853 (Ark. 1900); *State v. Waite*, 70 N.W. 596, 597–98 (Iowa 1897). And they have continued to do so after the codification of the modern federal-officer removal statute in 1948. *See, e.g.*, *Battle v. State*, 258 A.3d 1009, 1021–25 (Md. Ct. Spec. App. 2021); *State v. Deedy*, 407 P.3d 164, 188–89 (Haw. 2017); *State v. Velky*, 821 A.2d 752, 759–60 (Conn. 2003). Likewise, state courts regularly adjudicate whether state officers sued for violating federal rights are entitled to official or qualified immunity. *See, e.g.*, *Rustici v. Weidemeyer*, 673 S.W.2d 762, 772 (Mo. 1984); *Johnson v. Morris*, 453 N.W.2d 31, 37–40 (Minn. 1990); *Moody v. Ungerer*, 885 P.2d 200, 202–03 (Colo. 1994); *Gentile v. Bauder*, 718 So. 2d 781, 784–75 (Fla. 1998); *Clancy v. McCabe*, 805 N.E.2d 484, 493–94 (Mass. 2004); *King v. Betts*, 354 S.W.3d 691, 703 (Tenn. 2011).

B.  *Meadows's Charged Conduct Was Not Performed Under Color of Federal Office.*

Even if section 1442(a)(1) applied to former officers, we would still affirm because Meadows fails to prove that the conduct underlying the criminal indictment relates to his official duties. Section 1442(a)(1) permits a federal officer to remove a state prosecution that is "for or relating to any act under color of [his] office." The officer must establish a "causal connection between the charged conduct and asserted official authority." *Acker*, 527 U.S. at 431 (citation and internal quotation marks omitted). So we must identify the "act" or charged conduct underlying Georgia's

prosecution, the scope of Meadows's federal office, and the existence of a causal nexus between Meadows's conduct and his office.

We proceed in three parts. First, we explain that Meadows's culpable "act" was his alleged *association with* the conspiracy to overturn the presidential election, as charged in the indictment. Second, we explain that Meadows's "color" of office did not include superintending state election procedures or electioneering on behalf of the Trump campaign. Third, we conclude that Meadows's association with the alleged conspiracy was not related to his office of chief of staff. Simply put, whatever the precise contours of Meadows's official authority, that authority did not extend to an alleged conspiracy to overturn valid election results.

### 1. The "Act"

We must first define Meadows's section 1442(a)(1) "act" underlying the RICO charge, for the inchoate crime of conspiracy. Georgia argues—and the district court ruled—that Meadows's culpable "act" was his *association with* the alleged conspiracy. The district court determined that evaluating that "act" required looking to the "heart" of Meadows's conspiracy-related activity, instead of individually evaluating each overt act alleged in the indictment. *See Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 234 (4th Cir. 2022). The district court looked to the "gravamen," *Acker*, 527 U.S. at 447 (Scalia, J., concurring in part and dissenting in part), and "heavy majority of overt acts," instead of evaluating whether any particular act related to Meadows's office. The district court treated

the overt acts in the indictment as "relevant evidence" of, but not identical to, the "act" required by section 1442(a)(1).

Meadows, on the other hand, argues that each overt act in the indictment is an "act" for purposes of federal-officer removal. He argues that so long as any *one* of his actions—sending any message or participating in any meeting—related to his official duties, he is entitled to remove. Meadows further argues that the district court applied an incorrect legal test by looking to the "heart" or "gravamen" of Georgia's indictment because it could not do any weighing at all—it was required to accept Meadows's interpretation of "act" at face value.

We agree with Georgia. Looking to the heart of the indictment is consistent with our precedents defining a defendant's culpable "act" for purposes of federal-officer removal. Our precedents provide that the "act" anchoring removal must be defined by the "claim" brought against the defendant, and that federal courts have jurisdiction only when "one *claim* cognizable under Section 1442 is present." *Nadler v. Mann*, 951 F.2d 301, 306 n.9 (11th Cir. 1992) (emphasis added); *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257 (4th Cir. 2017) (holding that removal is justified if a federal defense applies to any claim); *Convent Corp. v. City of North Little Rock*, 784 F.3d 479, 483 (8th Cir. 2015) (holding that removal is justified if one federal claim is present). So an accused's removal theory must accord with a claim—a *criminal charge*—brought against him.

Meadows is charged with the inchoate crime of conspiracy, that is, "participat[ing] in, directly or indirectly, [an] enterprise" to

illegally overturn the results of the presidential election. GA. CODE ANN. § 16-14-4(b). A criminal conspirator is not defined by any single *actus reus* in furtherance, but by his *agreement to join* the conspiracy. Indeed, the state need not prove that Meadows committed any of the overt acts charged in the indictment, *see Nordahl v. State*, 829 S.E.2d 99, 109 (Ga. 2019), or that he engaged in any overt act at all so long as one of his coconspirators did, *see Thomas v. State*, 451 S.E.2d 516, 517 (Ga. Ct. App. 1994). Not only that, but an overt act need not, in and of itself, be criminal in nature to support a conspiracy charge. *See McCright v. State*, 336 S.E.2d 361, 363 (Ga. Ct. App. 1985). In other words, Georgia does not prosecute Meadows because attending any individual meeting or sending any specific message was itself illegal; Georgia prosecutes Meadows because his alleged agreement to join and his alleged conduct undertaken to further the conspiracy are illegal. So we must look to the core of the factual allegations to identify whether Meadows's conduct in aggregate furthered the alleged enterprise to overturn the election.

To allow Meadows to remove the action if any *single* allegation in the indictment related to his official duties would run contrary to both the removal statute and precedent. *See Mesa*, 489 U.S. at 131–32 ("It must appear that the prosecution of him, for whatever offense, has arisen out of the *acts* done by him." (emphasis added) (citation and internal quotation marks omitted)). Meadows relies on *Baucom v. Martin* to argue that *each* overt act is dispositive for removal. 677 F.2d 1346, 1347–48 (11th Cir. 1982) (affirming Supremacy Clause immunity for a Federal Bureau of Investigations agent facing prosecution under Georgia's RICO statute for

allegedly administering one bribe). But *Baucom* was a Supremacy Clause immunity case and did not concern the propriety of federal-officer removal. *See id.* Even if it had, the charge against Baucom alleged only one overt act, so that act represented the "heart" of the state prosecution. But because Meadows's culpability does not depend on any discrete act, he cannot remove by proving that one act was undertaken in his official capacity. The district court correctly determined that we must look to the "heart" of Meadows's conduct to determine whether his section 1442(a)(1) "act"—of conspiring to "unlawfully change the outcome of the election in favor of Trump"—supports removal.

## 2. The "Color" of Meadows's Office

Section 1442(a) permits the removal of a criminal prosecution commenced against any officer "for or relating to any act *under color of such office*." 28 U.S.C. § 1442(a)(1) (emphasis added). Acts taken under color of office are those "vested with, or appear to be vested with, the authority entrusted to that office." *Color of Office*, BLACK'S LAW DICTIONARY (11th ed. 2019). The "color of office" element requires acts to be done "in enforcement of federal law." *Mesa*, 489 U.S. at 131–32 (citation and internal quotation marks omitted). Meadows must identify a source of positive law for his assertions of official authority for us to determine whether his alleged acts were attributable to exercises of that authority. *See In re Neagle*, 135 U.S. at 75 (an official act is an "act which [the officer] was *authorized to do by the law* of the United States" (emphasis added)); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (official actions

are those *"committed by law* to [the officer's] control or supervision" (emphasis added)).

Meadows asserts that he proved his authority by testifying to his official duties, and he describes the "color" of his office as nearly limitless. He argues that anything that could be described as "manag[ing] the President's time and attention to ensure the effective operation of government" fell within his duties. He asserts that his duties were "at least coextensive with those of the President" and that "he is federal operations." Meadows does not contest the finding that he "was unable to explain the limits of his authority." Instead, he argues that his failure is not fatal to removal because we must accept his assertions at face value under *Acker*. Meadows would have us abdicate any analysis of the limits of his authority and accept his "theory of the case" that virtually *any* function of federal operations falls within the color of office of the chief of staff. *Acker*, 527 U.S. at 432.

We cannot rubber stamp Meadows's legal opinion that the President's chief of staff has unfettered authority, and *Acker* does not instruct us to eschew our duty of independent review. *Acker* credited two judicial officers' "adequate threshold showing" on a question of statutory interpretation. 527 U.S. at 432. The Supreme Court credited the judges' "theory of the case" when it declined to "choose between [disputed] readings" of a municipal ordinance, but that deference involved crediting a *plausible* reading of a *specific* legal authority. *Id*. But Meadows's theory of the case is not plausible. *Acker* does not instruct us blindly to accept an expansive

proclamation of executive power relying on no source of positive law. Instead, our judicial duty demands an independent assessment of the limits of Meadows's office.

Meadows asserts that the White House chief of staff has duties related to the supervision of state elections and campaign-related "political" activity. In particular, he maintains that broad authority and few limitations can be found in the Elections Clause, the Take Care Clause, various election statutes, and the Hatch Act. But the district court concluded, and we agree, that the federal executive has limited authority to superintend the states' administration of elections—neither the Constitution, nor statutory law, nor precedent prescribe any role for the White House chief of staff. And even if some authority supported a role for the chief of staff in supervising states' administration of elections, that role does not include influencing which candidate prevails. After all, "[t]he Office of the President has no preference for who occupies it." *Thompson v. Trump*, 590 F. Supp. 3d 46, 82 (D.D.C. 2022).

a.  The White House Chief of Staff Has No Role
in Supervising State Elections.

Meadows concedes that the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." The Constitution empowers only the states and Congress to "regulate the conduct of [federal] elections." *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972); *see* U.S. CONST. art. I, § 4, art. II, § 1. As the Supreme Court has explained, the "Framers of the Constitution intended the States to keep for themselves, as

provided in the Tenth Amendment, the power to regulate elections." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (internal quotation marks omitted) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991)). The states are responsible for enacting "a complete code for . . . elections," including "regulations relati[ng] to . . . prevention of fraud and corrupt practices [and] counting of votes." *Moore v. Harper*, 143 S. Ct. 2065, 2085 (2023) (first alteration in original) (internal quotation marks omitted) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)).

Nor does federal statutory law provide the White House chief of staff any role in the supervision of state elections. For example, the Electoral Count Act, Pub. L. No. 45-90, 24 Stat. 373 (Feb. 3, 1887), assigns duties to congressional officials—the Vice President in his role as presiding officer of the Senate, the Speaker of the House, senators, and representatives—but not to the President or his chief of staff. *Cf. United States v. Sandlin*, 575 F. Supp. 3d 16, 23 (D.D.C. 2021). Although Meadows offers a list of statutes related to congressional oversight, he identifies only two sources of election-related authority within the executive branch: the Department of Justice Civil Rights Division and its Election Crimes Branch. But he fails to explain how the duties of his office or his charged conduct implicated either division of the Department.

Meadows argues that the Take Care Clause, U.S. CONST. art. II, § 3, empowers the President with broad authority to "ensure that federal voting laws are enforced." But he concedes that the President has no "direct control" over the individuals—members

of Congress and state officials—who conduct federal elections. And tellingly, he cites no legal authority for the proposition that the President's power extends to "assess[ing] the conduct of state officials." We are aware of no authority suggesting that the Take Care Clause empowers federal executive interference with state election procedures based solely on the federal executive's own initiative, and not in relation to another branch's constitutionally-authorized act.

> b.  <u>The White House Chief of Staff May Not Engage in Electioneering on Behalf of a Political Campaign.</u>

Meadows argues that the district court incorrectly determined that the Hatch Act imposed limitations on his authority because the Act "does not operate to define the role of a President or his senior aides." But the Act applies to the President's staff and Meadows testified that he was bound by it. It admits no exceptions to its prohibition on a federal official using his "official authority or influence for the purpose of interfering with or affecting the result of an election." 5 U.S.C. § 7323(a)(1). And the prohibition extends to any participation in "activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." 5 C.F.R. §§ 734.101, 734.302(b)(2).

We take Meadows's point that the President is an inherently "political leader[]," *United States v. Nixon*, 418 U.S. 683, 715 (1974), who occupies a unique role by personally embodying one of "the two political branches," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015). And the President's subordinates, in their official

duties, may "exercis[e] not their own but [the President's] discretion." *Myers v. United States*, 272 U.S. 52, 132 (1926). But although defining the limits of impermissible "political" activity is challenging, we reject Meadows's assertion that there is "literally no way in the real world" to separate governance from prohibited political or campaign-related activity.

Electioneering *on behalf of* a political campaign is incontrovertibly political activity prohibited by the Hatch Act. Campaigning for a specific candidate is not official conduct because the office of the President is disinterested in who holds it. *See Thompson*, 590 F. Supp. 3d at 82. Indeed, the political branches themselves recognize that electioneering is not an official federal function. The Hatch Act provides congressional limitations on campaign-related activity by federal employees. *See* 5 U.S.C. § 7323(a)(1). And the executive branch applies internal restrictions on electioneering: for example, the Office of Legal Counsel does not allow campaign travel to be considered an official expense. *See Payment of Expenses Associated with Travel by the President & Vice President*, 6 Op. O.L.C. 214, 216–217 (1982).

The district court did not err in ruling, based on the Hatch Act and Meadows's own testimony, that activity on behalf of the Trump reelection campaign was unrelated to Meadows's federal duties. Meadows testified that he understood the Hatch Act to prohibit him from "advocat[ing] for a particular candidate" and from "campaign[ing] actively . . . in [his] official title." And he concedes

that, for example, "[g]iving a speech in support of the President at a campaign rally" would fall outside the scope of his office.

Meadows cannot have it both ways. He cannot shelter behind his testimony about the breadth of his official responsibilities, while disclaiming his admissions that he understood electioneering activity to be out of bounds. That he repeatedly denied having any role in, or speaking on behalf of, the Trump campaign, reflects his recognition that such activities were forbidden to him as chief of staff.

### 3.  The Causal Nexus

Section 1442(a)(1) provides that prosecutions are removable only when brought against officers "for or relating to" any act under color of federal office. Meadows must establish some "causal connection" or "association" between his alleged conspiracy-related activity and his federal office, and the bar for proof is "quite low." *Caver*, 845 F.3d at 1144 (citation and internal quotation marks omitted). Still, Meadows must be "specific and positive" in showing that his charged conduct "was confined to his acts as an officer." *Symes*, 286 U.S. at 520. And the Supreme Court has explained that, in "a criminal case, a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." *Willingham*, 395 U.S. at 409 n.4; *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[D]icta from the Supreme Court is not something to be lightly cast aside." (citation and internal quotation marks omitted)).

As the removing party, Meadows bears the burden of proof. *See Leonard*, 279 F.3d at 972. Meadows was obligated to support the factual averments linking his conduct and his office "by competent proof." *United Food & Com. Workers Union, Loc. 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994) (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014) (applying the "competent proof" standard to federal-officer removal). In determining whether Meadows's proof was competent, the district court was entitled to evaluate the demeanor and presentation of witnesses, assess the credibility of testimony including Meadows's, and weigh competing evidence.

The district court carefully weighed all evidence relevant to Meadows's charged conduct before finding that he failed to "provide sufficient evidence" that his association with the alleged conspiracy was "related to any legitimate purpose of the executive branch." The district court credited Meadows's denials of certain overt acts and weighed only those he admitted committing. It found only the text to Representative Perry, requesting the phone number of the "leader of PA Legislature," to be related to Meadows's official duties. The district court determined that the remainder of Meadows's conduct involved either unauthorized interference with state election procedures or prohibited campaigning. We agree.

As we have explained, the Hatch Act limits a federal officer's electioneering. Meadows had no official authority to operate on

behalf of the Trump campaign. But he offers no other plausible justification for calling and soliciting Secretary Raffensperger to alter the certified returns for Georgia electors. Meadows testified to "setting . . . up [the telephone call] with the attorneys where they could find some kind of compromise" on the signature verification, but he admits that the attorneys involved were employed by either Trump personally or by the Trump campaign—no attorneys from the Office of White House Counsel or the Department of Justice were present. Meadows's participation in the call reflected a clear attempt to further Trump's *private* litigation interests: he urged the participants to "find[] a path forward that's less litigious." And Secretary Raffensperger testified that he "felt that it was a campaign call" because "[t]hose were Trump campaign lawyers."

Meadows's text to Watson was also self-evidently campaign-related. He inquired, "Is there a way to speed up Fulton county signature verification in order to have results before Jan 6 *if the trump campaign assist financially*." (Emphasis added). That electioneering activity is not part of the executive power. Meadows later testified that his text was not a "financial offer" and that he was not actually speaking on behalf of the campaign, but the district court was entitled to find otherwise.

Nor did Meadows's official duties include interference with state election procedures. Neither the Constitution, *see Roudebush*, 405 U.S. at 24, nor any federal statute, nor any precedent permits the President's chief of staff to oversee, disrupt, or change the state results of presidential elections. Authority over electoral

proceedings is expressly delegated to the states. *See Moore*, 143 S. Ct. at 2085. Meadows offers no official rationale for traveling to Cobb County and attempting to infiltrate the nonpublic signature-match audit being performed by law enforcement officers. Although Meadows testified that he was trying to ensure that "everything [was] being done right," he stated that he traveled to Georgia under his own discretion and that "no one directed [him] to go."

Meadows also cannot point to any authority for influencing state officials with allegations of election fraud. Meadows testified that his meeting with the Michigan state officials mostly discussed the purported fraud in the 2020 election and was related to "President Trump['s] . . . personal interest in the outcome of the election in Michigan." He testified to arranging a call between Trump and Watson, in which Trump reiterated allegations of fraud, asserted he had won Georgia "by hundreds of thousands of votes," and suggested to Watson that "when the right answer comes out you'll be praised." But the White House chief of staff has no role in overseeing signature verifications or recount processes, or in superintending states' administration of election procedures. Meadows cannot establish that any of these acts related to his federal office.

At bottom, whatever the chief of staff's role with respect to state election administration, that role does not include altering valid election results in favor of a particular candidate. So there is no "causal connection" between Meadows's "official authority" and his alleged participation in the conspiracy. *See Willingham*, 395

U.S. at 409 (citation and internal quotation marks omitted). Meadows is not entitled to invoke the federal-officer removal statute.

## IV. CONCLUSION

We **AFFIRM** the order remanding this criminal action.

ROSENBAUM, Circuit Judge, joined by ABUDU, Circuit Judge, con-
curring:

Imagine that the day the President of the United States
leaves office, sixteen states where his policies were unpopular in-
dict him and all his Cabinet members, simply for carrying out their
constitutionally authorized duties.[1]  Is it possible that state courts
in those sixteen jurisdictions would fairly, correctly, and promptly
resolve any federal defenses the former President and Cabinet
members might have?  Of course, it is.   It may well even be
likely.  But given the local sentiment that led to the indictments in
this hypothetical scenario, it's also possible they would not.

Yet under 28 U.S.C. § 1442(a)(1), the federal-officer removal
statute, the former President and Cabinet members would have no
guarantee that a federal court (the Supreme Court, in that context)
would ever consider their federal defenses on direct appeal.[2]  And
even if the Supreme Court eventually considered their cases, that
wouldn't happen until after they had spent significant time and
money defending themselves.  So even though a federal court

---

[1] This hypothetical scenario does not describe Mark Meadows's situation.
Meadows has not established that the State has charged him for or relating to
an act under color of his office as White House chief of staff.  For that reason,
he could not remove his case to federal court under 28 U.S.C. § 1442(a)(1),
even if that statute extended to former federal officers who undertook their
challenged acts while in office.

[2] A person convicted in state court can file a habeas action in federal court
under 28 U.S.C. § 2254, but not until after he's exhausted all remedies available
in state court.  So that person may serve a substantial part of his sentence of
incarceration before federal habeas is granted.

might have found their federal defenses meritorious as a matter of law and dismissed their cases, these former officials may not see a federal forum until much of the damage has been done.  In short, foreclosing removal when states prosecute former federal officers simply for performing their official duties can allow a rogue state's weaponization of the prosecution power to go unchecked and fester.

The consequences of that are profound.  For starters, prosecutions of former federal employees for undertaking locally unpopular actions—but actions that are still within the bounds of their official duties[3]—can cause a crisis of faith in our government and our courts.  Not only that, but these types of actions can cripple government operations, discourage federal officers from faithfully performing their duties, and dissuade talented people from

---

[3] I emphasize that this concurrence addresses only those state prosecutions of former federal officers whose charged acts fell within the scope of their official duties.  It does not pertain to state prosecutions of former federal officers for acting outside the scope of their official duties and violating state law.  That's so because, "[u]nder our federal system, it goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government." *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) (cleaned up).  And states have a "compelling . . . interest in conducting criminal trials in the state courts," *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1981), when anyone—including a former federal officer—has allegedly violated state criminal law and has not done so to carry out federal law.  As the Supreme Court has explained, "Absent any indication that the removal statute was intended to derogate from the State's interest in evenhanded enforcement of its laws, we see no justification for providing an unintended benefit to a defendant who happens to be a federal officer." *Manypenny*, 451 U.S. at 243.

entering public service.  After all, who needs the aggravation and financial burden from being criminally prosecuted (even in one state) just for carrying out official responsibilities?  And federal officers who are reluctant to do their duty, or a dearth of talented and enthusiastic people willing to serve in public office, could paralyze our democratic-republic system of government.

This nightmare scenario keeps me up at night.  In my view, not extending the federal-officer removal statute to former officers for prosecutions based on their official actions during their tenure is bad policy, and it represents a potential threat to our republic's stability.  Of course, my role as a judge does not allow me to re-write laws to fit my view of what's wise.  Rather, I must faithfully interpret the laws as they are written.  So today I join the Majority Opinion because it does that.

But *Congress* enjoys the prerogative to revise Section 1442(a)(1) to include former federal officers.  And I respectfully urge Congress to consider prompt action to do just that.  A simple amendment to Section 1442(a)(1) to cover former federal officers— that is, to allow former federal officers prosecuted for actions for or relating to their official duties to remove their cases to federal court—would fix this grave problem.

My analysis proceeds in two parts.  First, I show that Congress has long recognized removal as an invaluable tool in protecting current federal officers from state prosecutions brought against them only for carrying out their official responsibilities.  Second, I explain how extending this protection to former federal officers for

their acts in the line of duty also furthers the purposes of federal-officer removal.

## I.

Unfortunately, my nightmare scenario has some precedent in our nation's history—at least with respect to current federal officers. This section recounts just some of that history and shows how Congress has used federal-officer removal statutes to address the problem of state prosecution of (then-current) federal officers for carrying out their official (though locally unpopular) responsibilities in the past.

I begin with the first time this problem seems to have arisen, more than 200 years ago. During the War of 1812, the United States imposed an embargo on trade with England. *See Willingham*, 395 U.S. at 405. New Englanders detested that policy. *See id.* So out of a concern for "protect[ing] federal officers [who enforced the embargo] from interference [with their official duties] by hostile state courts," Congress enacted a federal-officer removal provision in an 1815 customs statute. *Id.* Among other things, that provision authorized customs officers to remove to federal court state prosecutions against them for conducting their official duties. *See Tennessee v. Davis*, 100 U.S. 257, 267–68 (1879).

Not twenty years later, the problem of state hostility to federal policies and the officers who executed them as part of their official duties arose again—this time in the South. In 1828 and

1832, Congress imposed tariffs that Southerners deeply disliked.[4] A South Carolina convention responded by purporting to nullify those federal tariffs. *See id.* It also professed to criminalize United States officers' local collection of duties under the tariff laws. *Id.*

Congress reacted by passing the Force Act of 1833. *Id.* As relevant here, that law authorized removal of any state criminal prosecution of a federal officer for performing his official duties under the revenue laws. *Id.* At the time, Senator Daniel Webster reasoned that removal would "give a chance to the [federal] officer to defend himself where the authority of the law was recognised [sic]," 9 Cong. Deb. 461 (1833), rather than a state forum that might resist federal policy. And the Supreme Court has characterized "[t]he purpose of" the Force Act's federal-officer removal provision as "prevent[ing] paralysis of operations of the federal government." *Gay v. Ruff*, 292 U.S. 25, 32 (1934).

Congress enacted federal-officer removal provisions during other periods of our history as well—for instance, during the Civil War and Reconstruction, when protracted state resistance against the federal government existed. *See* Act of March 3, 1863, ch. 81, § 5, 12 Stat. 755, 756–57 (1863); Act of July 13, 1866, ch. 184, § 67, 14 Stat. 171 (1866).[5] In support of these provisions, legislators rose to

---

[4] *Nullification Proclamation: Primary Documents in American History*, Library of Congress Research Guides, (last visited Dec. 17, 2023) https://perma.cc/7GWT-GJWK.

[5] Also in 1866, Congress enacted the statutory predecessor to 28 U.S.C. § 1443(2), which authorized removal of all criminal prosecutions "commenced

describe the conditions federal officers were facing in states hostile to their execution of official federal duties.

Senator Daniel Clark recounted, "A great many vexatious suits have been brought . . . where Federal officers have been pushed very hard and put to great hardships and expense, and sometimes *convicted of crime, for doing things which were right in the line of duty*, and which they were ordered to do and which they could not refuse to do." Cong. Globe, 39th Cong., 1st Sess. 1880 (1866) (emphasis added). And Representative Samuel McKee pointed out some consequences of these legal actions: in his words, these actions were "harassing, annoying, and even driving out of the State the men who stood true to the flag . . . . There no protection is guarantied [sic] to a Federal soldier." Cong. Globe, 39th Cong., 1st Sess. 1526 (1866).

So it's no surprise that federal officers later relied on the 1863 and 1866 federal-officer removal provisions when they faced indictment for acting within the scope of their official federal duties. For instance, in 1879, a federal officer was executing his official responsibilities as a revenue collector to seize illegal distilleries, when a group of armed men fired on him. *Davis*, 100 U.S. at 260–61. In

---

in any State court against any officer, civil or military, or other person, for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from this act or the act establishing a Bureau for the relief of Freedmen and Refugees, and all acts amendatory thereof." Civil Rights Act of 1866, 14 Stat. 27 (1866); *see also City of Greenwood, Miss. v. Peacock*, 384 U.S. 808, 821–22 (1966). Congress was concerned with state interference with federal Reconstruction and legislated accordingly.

self-defense, the officer returned fire, striking and killing one of the aggressors. *Id.* Tennessee charged the federal officer with murder. *Id.* But the 1866 federal-officer removal provision allowed the officer to remove the matter to federal court. *Id.* at 271.

As the Supreme Court explained, if a federal officer acting within his official duties "can be arrested and brought to trial in a State court, for an alleged offence [sic] against the law of the State, yet warranted by the Federal authority they possess, and if the [federal] government is powerless to interfere at once for their protection,—if their protection must be left to the action of the State court,—the operations of the [federal] government may at any time be arrested at the will of one of the States." *Id.* at 263. Even more to the point, the Supreme Court warned that "[t]he State court may administer not only the laws of the State, but equally Federal law, in such a manner as to paralyze the operations of the government." *Id.*

In later years, the Supreme Court offered more observations about these federal-officer removal provisions. In *Mitchell v. Clark*, the Court noted, for example, that the purpose of the Civil War and Reconstruction federal-officer removal provisions was to protect federal officers "engaged in the discharge of very delicate duties among a class of people who . . . were intensely hostile to the government"— those rebelling against the Union. 110 U.S. 633, 639 (1884).

Prohibition presented another period in which federal law won no popularity contests in some locales. So through the

National Prohibition Act, Congress extended federal-officer removal to prohibition officers. National Prohibition Act, ch. 85, § 28, 41 Stat. 305, 316 (1919). That provision traced its origins to the 1863 and 1866 federal-officer removal provisions. *State of Maryland v. Soper*, 270 U.S. 9, 31–32 (1926). As the Supreme Court explained, "Congress not without reason assumed that the enforcement of the National Prohibition Act was likely to encounter in some quarters a lack of sympathy and even obstruction, and sought . . . to defeat the use of local courts to embarrass those who must execute it." *Id.* at 32. So it authorized federal-officer removal to combat that problem.

Local opposition to federal policy—and use of the federal-officer removal statute to mitigate prejudice from that opposition—is by no means a vestige of the past. In 2006, the Tenth Circuit upheld federal-officer removal (and immunity) for an employee of the U.S. Fish and Wildlife Service who was prosecuted for misdemeanor trespass in Wyoming state court. *Wyoming v. Livingston*, 443 F.3d 1211, 1225, 1230 (10th Cir. 2006). The defendant had entered private property while capturing and collaring wolves as part of a federal operation to reintroduce grey wolves to the region. *Id.* at 1213–15. But because Wyoming is "heavily dependent on livestock for its economic well-being," the wolf reintroduction program was "met with vehement local opposition." *Id.* at 1213–14. Indeed, the court noted record evidence that the prosecution was "not a bona fide effort to punish a violation of Wyoming trespass law . . . but rather an attempt to hinder a locally unpopular federal program." *Id.* at 1231. So it concluded that federal-officer

removal was proper to prevent that local "hind[rance]." *See id.* at 1225, 1231.

This brief walk through some of our history shows that states have in fact indicted federal officers for carrying out their official duties when those duties have been locally unpopular. And that local opposition is not limited to a particular policy, era, or region of the country. But recognizing the potential harms from state indictments of federal officers for acting within the scope of their jobs, Congress has enacted (and reenacted) federal-officer removal protection to "protect federal officers from interference by hostile state courts." *Willingham*, 395 U.S. at 405.

## II.

With this historical backdrop in mind, I return to my present concern: the lack of removal protection for former federal officers prosecuted by states for performing their official (but perhaps locally unpopular) federal duties.

To be sure, there's a certain logic behind the limitation of Section 1442(a)(1)'s removal protection to current federal officers. Prosecuting current (not former) federal officers for performing their sworn federal duties makes the most sense if a state seeks to interfere with ongoing federal functions. Prosecuting someone who is no longer a federal officer, generally, will not directly paralyze ongoing federal operations. And as the Majority Opinion points out, we must "retain[] the highest regard for a State's right to make and enforce its own criminal laws." Maj. Op. at 19 (quoting *Manypenny*, 451 U.S. at 243).

It's also true that state courts are certainly capable of evaluating federal defenses. *See id.* at 20–21. And in most cases, we can count on them to do so correctly and fairly. Plus, state officials may try to be respectful of ongoing government operations by waiting to charge federal officers until they leave office.

But Congress created federal-officer removal statutes because it recognized that the risks to our federal government are just too great if a state court isn't capable—for whatever reason—of quickly, correctly, and fairly adjudicating federal defenses when a federal officer has been indicted for carrying out his official federal responsibilities. And a state trying to interrupt a federal policy or (misguidedly) vindicate a local interest it feels a federal law has threatened could view prosecuting former federal officers for performing their official federal duties as a way to effect those objectives. That's especially so because, as things currently stand, a state could not hope to accomplish these goals by indicting current federal officers without risking the possibility that they would remove the actions to federal court.

Yet state prosecutions of former federal officers for doing their official duties can also cripple the federal government, just like prosecutions of current federal officers can. Consider an ongoing federal policy or operation. If a state prosecutes a former federal officer for his official role in that, current federal officers who are responsible for continuing to carry out that policy or operation may well be chilled from doing so out of concern that they, too, will be prosecuted by the state when they leave their positions.

Or if states start indicting high-profile former federal offic-ers, upon stepping down, for their official actions while in office, our national leaders may cease taking any significant action for the country in an effort to avoid later state prosecution. After all, it's hard to think of any federal policy that's not unpopular somewhere in the country. If undertaking meaningful action within the scope of official authority becomes too risky for a federal officer because she will have to pay the state piper later, why bother even entering public service in the first place? But without talented and enthusi-astic people willing to serve our country, the future would be bleak.

And I haven't even started to discuss the undermining effect that constant and repeated state prosecutions of former federal of-ficers for doing their official duties would have on the perceived legitimacy of our system of government. The longer a state pros-ecution drags on when the former federal officers are entitled to dismissal, the more those who disfavor the officers' official duties may wrongly come to believe that the federal government has acted illegally. And the more this happens, the more it chips away at (and over time, takes a sledgehammer to) our government's per-ceived legitimacy.

These harms are serious. Fortunately, though, they can also be easily addressed if Congress amends the federal-officer removal statute to expressly include former federal officers.

The government's interests in protecting against rogue state prosecutions of federal officers for carrying out their official duties

do not evaporate as soon as a particular officer leaves her post. Nor do they evaporate upon a change in presidential administration. So the protections for federal officers likewise should not evaporate when they leave their government employment.

Our decision today has consequences both for former federal officers and the federal government itself. To mitigate those consequences, and to reinforce the purposes of federal-officer removal, I respectfully urge Congress to amend Section 1442(a)(1) to cover former officers.

### III.

In sum, the text and structure of the federal-officer removal statute—especially given our recent precedent *United States v. Pate*, 84 F.4th 1196 (11th Cir. 2023) (en banc)—compel our conclusion that former federal officers cannot invoke the statute. But not covering former federal officers comes with a great potential cost to our government and those who serve in it. So I respectfully urge Congress to amend Section 1442(a)(1) to protect former federal officers.